**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JOSEPH ZAPPIA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>THE ODP CORPORATION, GERRY P. SMITH, WENDY L. SCHOPPERT, QUINCY L. ALLEN, KRISTIN A. CAMPBELL, CYNTHIA T. JAMISON, EVAN LEVITT, SHASHANK SAMANT, and AMY SCHIOLDAGER,<br><br>Defendants. | Case No.: 9:26-cv-81028-AMC<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>**REDACTED PUBLIC VERSION** |

## TABLE OF CONTENTS


NATURE OF THE ACTION ..... 4

JURISDICTION AND VENUE ..... 10

PARTIES AND RELEVANT NON-PARTIES ..... 11

SUBSTANTIVE ALLEGATIONS ..... 14

A. ODP's Business ..... 14

B. ODP's Code of Ethical Behavior ..... 15

C. ODP Retains J.P. Morgan to Help Evaluate Proposals From Potential Counterparties to Acquire ODP ..... 15

D. Atlas Submits an Initial Bid to Acquire ODP for $30.00 Per Share in Cash ..... 17

E. The Board Authorizes ODP Management to Jointly Engage an Economist With [redacted] to Evaluate the Antitrust Risks of an Acquisition of ODP By [redacted] ..... 18

F. ODP Reports Strong Q1 2025 Results ..... 22

G. The CRA Economist Jointly Retained by [redacted] and ODP Initially Concludes That There is a 50-60% Chance That Regulators Would Approve a Sale of ODP to [redacted] ..... 23

H. J.P. Morgan Presents Three Principal Financial Analyses to Illustrate ODP's Potential Value, Including Two Trade Multiple Analyses Based on Multiples of Firm Value to Estimated Adjusted EBITDA in 2025 and 2026 ..... 24

I. [redacted] Offers $24.00 Per Share in Cash for ODP, Which Exceeds the Prior Bids of Atlas and Other Competing Bidders ..... 29

J. The CRA Economist Jointly Retained by [redacted] and ODP Increases Its Estimate of the Likelihood of Regulatory Approval of a Sale of ODP to [redacted] to 70-80% ..... 34

K. J.P. Morgan Again Presents Three Principal Financial Analyses to Illustrate ODP's Potential Value, Including the Two Trade Multiple Analyses Based on Firm Value and Adjusted EBITDA Estimates ..... 36

L. ODP Reports Strong Q2 2025 Results ..... 39

M. A Wall Street Analyst Reaffirms a Price Target of $35.00 Per Share ..... 39

N. The Board Continues to Rebuff [redacted] ..... 40

O. Party K Submits a Bid With a Price Range of $30.00 to $31.75 Per Share in Cash ..... 44

P. An Independent ODP Investor Opines That Synergies Justified Sycamore Paying $29.00 Per Share or Higher for ODP, While the Deregulatory Agenda of the New Trump Administration Sharply Increased the Likelihood of Regulatory Approval of a Sale of ODP to Staples ..... 44

Q. The CRA Economist Jointly Retained by [redacted] and ODP Concludes That the Likelihood of Regulatory Approval of a Sale of ODP to [redacted] is 90% ..... 45

R. A Well Known Value Investor Shares the View That the Deregulatory Agenda of the New Trump Administration Sharply Increased the Likelihood of Regulatory Approval of a Sale of ODP to Staples, and Tremendous Synergies Made it a "No Brainer" for Sycamore to Pay

in Excess of $30.00 Per Share for ODP ........ 47

S. The Board Decides to Proceed With Atlas ........ 48

T. A Wall Street Analyst Reaffirms a Price Target of $41.00 Per Share ........ 48

U. The Trade Multiple Analyses and Two Out of Three Analyst Price Targets in J.P. Morgan's September 2025 Presentations Fail to Support the Fairness of the Merger Consideration ... 49

V. J.P. Morgan Presents a False and Misleading Fairness Opinion to the Board ........ 53

W. The Board Approves the Merger, and Subsequently Approves the Issuance of Materially False and Misleading Proxy By Order of the ODP Board ........ 55

MATERIALLY FALSE AND MISLEADING MISREPRESENTATIONS AND OMISSIONS IN THE PROXY ........ 57

A. The Proxy Failed to Disclose That There Were Analyses Presented by J.P. Morgan That Did Not Support the Fairness of the Merger Consideration ........ 57

B. The Proxy Failed to Disclose the Expert Opinions of the Jointly Retained CRA Economist Regarding the Likelihood of Regulatory Approval of Combining ODP and [redacted] ........ 61

C. The Proxy Failed to Disclose the Amount of the Bid Submitted by [redacted] and How it Compared to the Bids of Atlas and Other Potential Counterparties ........ 67

SOURCES OF DEFENDANTS' DUTIES WITH RESPECT TO CONTENTS OF PROXY .... 70

LOSS CAUSATION ALLEGATIONS ........ 73

CLASS ACTION ALLEGATIONS ........ 76

COUNT I ........ 78

COUNT II ........ 80

PRAYER FOR RELIEF ........ 81

JURY DEMAND ........ 81

Plaintiff Joseph Zappia ("Plaintiff"), by his undersigned counsel, upon personal knowledge as to himself and his own actions, and upon information and belief as to all other matters based upon his counsel's review of, among other documents, public filings of The ODP Corporation ("ODP" or the "Company") with the Securities and Exchange Commission ("SEC"), and confidential documents produced to Plaintiff ("Section 220 Documents") pursuant to a demand ("Section 220 Demand") under the Delaware books and records statute, 8 Del. C. § 220, alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this securities class action to recover damages for Defendants' negligent violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 14a-9 promulgated thereunder, in connection with the sale of ODP to Atlas Holdings LLC ("Atlas") for $28.00 per share in cash ("Merger Consideration") via a transaction ("Merger") governed by an Agreement and Plan of Merger dated September 22, 2025 ("Merger Agreement").[1]

2. Plaintiff's claims arise from materially false and misleading misrepresentations and omissions in the Definitive Proxy Statement ("Proxy") (i) authorized by the Individual Defendants (as defined below), (ii) signed by Defendant Gerry P. Smith in his capacity as ODP's Chief Executive Officer ("CEO"), and (iii) filed by ODP with the SEC on October 27, 2025. The materially false and misleading Proxy solicited ODP stockholders to vote to approve the Merger at a special meeting held on December 5, 2025.

3. The materially false and misleading misrepresentations and omissions in the Proxy concerned three subjects: (i) the extent to which the financial analyses of ODP's financial advisor

---

[1] *See* 15 U.S.C. §§ 78n(a) and 78t(a), and 17 C.F.R. § 240.14a-9.

(J.P. Morgan) supported the fairness of the Merger Consideration; (ii) the likelihood of securing regulatory approval of a sale of ODP to [redacted], a key competitor of ODP [redacted] "Party D" in the Proxy); and (iii) the amount of the bid submitted by [redacted] and how it compared to the bids submitted by Atlas and other potential counterparties.

4. *First*, on May 27, 2025, and on July 22, 2025, J.P. Morgan discussed its three principal valuation analyses with the Board. Two of those analyses ("Trade Multiple Analyses") valued ODP as a multiple of Firm Value (as defined below) divided by Estimated Adjusted EBITDA (as defined below) in 2025 and 2026, respectively. The third analysis ("DCF Analysis") valued ODP on a discounted cash flow basis. In its presentations of the Trade Multiple Analyses and DCF Analysis, J.P. Morgan flagged the midpoint values per share generated by these analyses as an important data point for the Board's consideration when assessing ODP's value. J.P. Morgan's presentations also included price targets from three Wall Street analysts that were designated "For Reference Only."

5. As J.P. Morgan was finalizing its opinion concerning the fairness of the Merger Consideration, its final presentation to the Board on September 21, 2025, showed that (i) the midpoint values per share in the two Trade Multiple Analyses were $30.67 and $29.13 per share, and (ii) two out of the three Wall Street analysts covering ODP set price targets of $35.00 per share and $41.00 per share, respectively. Thus, virtually all of J.P. Morgan's financial analyses indicated that the Merger Consideration of $28.00 per share was unfair. The Proxy omitted J.P. Morgan's Trade Multiple Analyses and recent analyst price targets, and disclosed only the most recent DCF Analysis (which was the *only* financial analysis with a midpoint value supporting the fairness of the Merger Consideration).

6. Nevertheless, the Proxy asserted several times that the "financial ***analyses***" (plural) presented by J.P. Morgan to the Board supported the fairness of the Merger Consideration and approval of the Merger. Thus, when voting, ODP stockholders were left with the false and misleading impression that *several* J.P. Morgan analyses besides the DCF Analysis supported the fairness of the Merger Consideration, when, in fact, the two Trade Multiple Analyses and two out of three analyst price targets omitted from the Proxy indicated that the Merger Consideration was unfair. As the Proxy itself acknowledged, the failure to "consider[] the full narrative description of [J.P. Morgan's] financial analyses . . . could create a misleading or incomplete view of J.P. Morgan's analyses."

7. *Second*, [redacted], [redacted] had made two previous attempts to acquire ODP [redacted]. [redacted] was stymied both times by regulators who opposed the deals based on antitrust grounds. After acquiring [redacted], [redacted] tried again in 2021 during the Biden Administration, but ODP declined to proceed with a transaction in part due to antitrust concerns. [redacted] made a fourth and final attempt in 2025 when it offered to acquire ODP for $24.00 per share in cash.

8. Because of ODP's antitrust concerns, [redacted] and ODP agreed in March 2025 to jointly retain an economist from a leading consulting firm (Charles River Associates ("CRA")) to undertake an antitrust review ("Joint Antitrust Review") to evaluate the likelihood of regulators approving a sale of ODP to [redacted]. The CRA economist concluded that there was a "high likelihood" of regulatory approval, initially quantifying that likelihood at 50-60%, then quantifying it at 70-80%, and finally quantifying it at 90%. The CRA economist's conclusion that there was a "high likelihood" of regulatory approval of a sale of ODP to [redacted] aligned with the views of at

least two ODP investors who published articles in August and September 2025 opining that a sale of ODP to [redacted] would likely secure regulatory approval because of the far less restrictive regulatory environment taking shape under the then new Trump Administration. One of those investors also observed that since 2021, Amazon had emerged as a serious threat to ODP and [redacted], thus supporting a merger of ODP [redacted] to more effectively compete against Amazon.

9. The Proxy, however, failed to disclose the CRA economist's conclusions and quantifications concerning the likelihood of regulatory approval, and instead indicated only that a sale of ODP to [redacted] posed "significant antitrust risk." Thus, when voting, ODP stockholders were unaware that there was an expert opinion from an economist jointly retained by ODP and [redacted] quantifying the likelihood of regulatory approval of a sale of ODP to [redacted] at 90%. Instead, the Proxy left ODP stockholders with the false and misleading impression that there was a solitary viewpoint that a sale of ODP to [redacted] was simply not a viable alternative to the Merger because of "significant antitrust risk."

10. *Third*, the Proxy never disclosed that—without the benefit of any confidential information—[redacted] had bid $24.00 per share, which was the highest bid from late June 2025 through mid-July 2025, and then until early August 2025, the highest bid alongside other competing offers. Instead, the Proxy indicated that bids from other potential counterparties offered the "highest valuation" during an extended stretch of the sales process. Thus, when voting, ODP stockholders were left with the false and misleading impression that [redacted] bid had never been competitive, thus further discrediting [redacted] as a bidder in the minds of ODP stockholders. In fact, a sale of ODP to [redacted] was a highly viable alternative to the Merger at a significantly higher price based on (i) the CRA economist's conclusion concerning

the likelihood of regulatory approval [redacted] and (ii) the ability of [redacted] to justify paying $29.00 or more per share [redacted]

11. In sum, the Proxy contained the following three categories of materially false and misleading misrepresentations and omissions:

| **Categories of Materially False and Misleading Misrepresentations and Omissions** | **Truth Concealed From Public ODP Stockholders** |
| --- | --- |
| Statements and omissions concerning the extent to which J.P. Morgan's financial analyses supported the fairness of the Merger Consideration. | Two out of three of J.P. Morgan's principal financial analyses (i.e., the Trade Multiple Analyses) in September 2025, and two out of the three price targets set by analysts in August and September 2025, did not support the fairness of the Merger Consideration. |
| Statements and omissions concerning the likelihood of re ulator a roval of a sale of ODP to [redacted]. | The CRA economist jointly retained by ODP and [redacted] concluded that there was a high likelihood of regulatory approval of a sale of ODP to [redacted] which the CRA economist initially quantified at 50-60%, later quantified at 70-80%, and ultimately quantified at 90%. |
| Statements and omissions concerning the bids that offered the highest valuation. | [redacted] bid of $24.00 per share in cash remained the highest bid from late June 2025 through early August 2025. |

12. The Proxy advised that (i) consummating the Merger required approval by a majority of ODP stockholders, and (ii) dissenting ODP stockholders who did not vote for the Merger were entitled to an appraisal of the fair value of their shares under Delaware law.

13. On December 5, 2025, based on the materially false and misleading Proxy, a majority of ODP shareholders voted for the Merger, and forwent their appraisal rights.

14. On December 10, 2025, the Merger closed, cashing out ODP stockholders for less

than the fair value of their shares (as per virtually all of J.P. Morgan's analyses), and depriving them of the opportunity to share in ODP's future growth.

15. Absent the materially false and misleading misrepresentations and omissions in the Proxy, (i) a majority of ODP stockholders would not have voted for the Merger, and thus the Merger would not have been approved and would not have closed, and (ii) ODP stockholders who voted for the Merger would have instead sought appraisal of the fair value of their shares of ODP common stock under applicable Delaware law.

16. Because of the materially false and misleading misrepresentations and omissions in the Proxy, Class members did not know the information specified in the table above, and consequently suffered damages when they were cashed out of their shares at the unfair price of $28.00 per share. That the Merger Consideration undervalued ODP is evidenced by, among other facts:

(i) the midpoint values of $30.67 and $29.13 per share in J.P. Morgan's Trade Multiple Analyses, which indicated that the Merger Consideration of $28.00 per share undervalued ODP;

(ii) an analyst price target of $35.00 published on August 7, 2025, based on, among other things, a "new hospitality agreement [that] significantly broadens ODP's [Total Addressable Market]," and new initiatives to increase operational efficiencies and drive higher, more profitable revenue;

(iii) an analyst price target of $41.00 published on September 15, 2025, based on, among other things, improving retail trends, and multiple large new contracts;

(iv) the published views of at least two ODP investors opining that Sycamore could have justified paying $29.00 or more per share for ODP based on the tremendous synergies (> $1 billion) that could be realized by combining ODP and Staples (with one investor calling it a "no-brainer" for Sycamore); and;

(v) in February 2025, when ODP's prospects were more uncertain, Atlas submitted a bid of $30.00 per share to acquire ODP. It later substantially reduced that bid due to temporary market volatility caused by President Trump's tariffs. But ODP successfully mitigated the impact of tariffs, as explained by Defendant Smith on successive earnings calls. Further, for two straight quarters (i.e., Q1 and Q2 2025),

> Smith publicly stated in press releases and on earnings calls that ODP's prospects had substantially improved. Thus, by reference to Atlas' prior bid of $30.00 per share in February 2025, when ODP's prospects were more uncertain, $28.00 per share clearly undervalued ODP as of September 2025, when ODP's prospects had substantially improved.

17. For the foregoing reasons, as further set forth below, Plaintiff seeks to recover damages from Defendants on behalf of himself and other Class members for violations of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)), and SEC Rule14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9). This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19. Personal jurisdiction exists over each Defendant because either: (i) the Defendant conducts business in or maintains operations in the United States; or (ii) the Defendant is an individual who is either present in the United States for jurisdictional purposes or has sufficient minimum contacts with the United States to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice. *See United States SEC v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997) (where "the court's personal jurisdiction is invoked based on the applicable federal securities laws, which provide for worldwide service of process, we conclude that the proper forum for minimum contacts analysis is the United States."); *accord Kammona v. Onteco Corp.*, 587 F. App'x 575, 579-80 (11th Cir. 2014).

20. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391 because many of the acts and omissions that constitute the violations of the federal securities

laws complained of herein occurred in this District, including the dissemination of a materially false and misleading Proxy from this District. Further, ODP's executive offices are located in this District in Boca Raton, Florida.

## PARTIES AND RELEVANT NON-PARTIES

### A. Parties

21. Plaintiff Joseph Zappia was at all relevant times a holder of shares of ODP common stock through the closing of the Merger.

22. Defendant The ODP Corporation (defined above as "ODP") is a Delaware corporation with principal executive offices located at 6600 North Military Trail, Boca Raton, Florida 33496. Before the consummation of the Merger, ODP's common stock was listed on the Nasdaq Global Select Market ("Nasdaq") under the symbol "ODP." ODP is named in Count I asserting claims under Section 14(a) of the Exchange Act ("Section 14(a) Claims") as the issuer of the Proxy.

23. Defendant Gerry P. Smith was the CEO and a director of ODP at all relevant times through the closing of the Merger. Smith is named in Count I asserting Section 14(a) Claims since he signed the Proxy in his capacity as ODP's CEO, and was also a member of the Board, and the Proxy was issued "By Order of the ODP Board." Smith is also named in Count II asserting claims under Section 20(a) of the Exchange Act ("Section 20(a) Claims") as a control person of Defendant ODP. After the Merger closed, Smith left the CEO position (and was replaced by a successor appointed by Atlas). In 2024, the full year prior to his departure, Smith earned $1.43 million in cash compensation (with any equity awards granted in 2024 vesting over three years).

24. Defendant Wendy L. Schoppert was the Chair of the Board at all relevant times through the closing of the Merger. Schoppert is named in Count I asserting Section 14(a) Claims

as a member of the Board since the Proxy was issued "By Order of the ODP Board." Schoppert is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

25. Defendant Quincy L. Allen was an ODP director at all relevant times through the closing of the Merger. Allen is named in Count I asserting Section 14(a) Claims as a member of the Board since the Proxy was issued "By Order of the ODP Board." Allen is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

26. Defendant Kristin A. Campbell was an ODP director at all relevant times through the closing of the Merger. Campbell is named in Count I asserting Section 14(a) Claims as a member of the Board since the Proxy was issued "By Order of the ODP Board." Campbell is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

27. Defendant Cynthia T. Jamison was an ODP director at all relevant times through the closing of the Merger. Jamison is named in Count I asserting Section 14(a) Claims as a member of the Board since the Proxy was issued "By Order of the ODP Board." Jamison is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

28. Defendant Evan Levitt was an ODP director at all relevant times through the closing of the Merger. Levitt is named in Count I asserting Section 14(a) Claims as a member of the Board since the Proxy was issued "By Order of the ODP Board." Levitt is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

29. Defendant Shashank Samant was an ODP director at all relevant times through the closing of the Merger. Samant is named in Count I asserting Section 14(a) Claims as a member of the Board since the Proxy was issued "By Order of the ODP Board." Samant is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

30. Defendant Amy Schioldager was an ODP director at all relevant times through the

closing of the Merger. Schioldager is named in Count I asserting Section 14(a) Claims as a member of the Board since the Proxy was issued "By Order of the ODP Board." Schioldager is also named in Count II asserting Section 20(a) Claims as a control person of Defendant ODP.

31. Defendants Smith, Schoppert, Allen, Campbell, Jamison, Levitt, Samant, and Schioldager are referred to herein as the "Individual Defendants." The Individual Defendants and Defendant ODP are referred to herein as the "Defendants."

**B. Relevant Non-Parties**

32. Atlas Holdings LLC (defined above as "Atlas") is a private equity firm. Atlas and its affiliates own and operate numerous companies in sectors such as automotive supply, building materials, capital equipment, construction services, food manufacturing and distribution, metals processing, packaging, paper, power generation, printing, pulp, supply chain management and wood products.

33. [redacted] had made two attempts to acquire ODP: [redacted]. Both times, federal regulators intervened to oppose the deal on antitrust grounds, and the proposed transactions did not proceed.

34. After acquiring [redacted] tried again in January 2021 during the Biden Administration, submitting an offer to acquire ODP for $40.00 per share in cash. ODP rejected that bid based in part on [redacted] purported failure to adequately address antitrust concerns that had triggered regulatory opposition to prior bids.

35. As discussed further below, [redacted] again proposed to acquire ODP during the

sales process run by the Board from February through September 2025. The Board again rejected [redacted] overture based on antitrust concerns. But as at least two ODP investors subsequently observed in August and September 2025, the regulatory landscape had changed dramatically under the Trump Administration with the harsh anti-merger stance under prior Democratic Administrations being replaced with a pro-business, deregulatory agenda much friendlier to proposed mergers of leading industry players. Further, the competitive threat posed by Amazon to office supply retailers and distributors had significantly increased in the years since [redacted] prior bid in 2021. Consistent with these views, the CRA economist jointly retained by ODP and [redacted] ultimately concluded that the likelihood of securing regulatory approval of a sale of ODP to [redacted] was 90%. The Proxy, however, failed to disclose the CRA economist's conclusion in the Proxy. Accordingly, when they voted, ODP stockholders were unaware that an expert jointly retained by ODP and [redacted] had concluded that a sale of ODP to [redacted] had a 90% chance of securing regulatory approval. Instead, the Proxy left ODP stockholders with the false and misleading impression that a sale of ODP to [redacted] was not a viable alternative to the Merger due to significant antitrust risk.

## **SUBSTANTIVE ALLEGATIONS**

### A. **ODP's Business**

36. ODP is a leading provider of office supplies and services. As of December 31, 2024, it operated nearly 900 retail office supply stores in the United States under the Office Depot and OfficeMax brands, as well as an e-commerce website and a business-to-business ("B2B") distribution and supply chain platform selling and delivering office supplies and services to businesses of all sizes. ODP reported total sales of nearly $7 billion in 2024.

**B. ODP's Code of Ethical Behavior**

37. On November 6, 2024, ODP published an updated version of its Code of Ethical Behavior ("Code"), which was signed by Smith. On page 2 of the Code, Smith advised ODP employees:

> It is your responsibility to ensure your behaviors and decisions follow the Code of Ethical Behavior (the "Code"), our company's guide for doing what is right. No one is exempt from our Code. ***It applies to all of us; me; our Board of Directors***, the leadership team and all of our associates around the world. It establishes the principles our company believes in and the parameters by which we conduct business . . . ***Our common principles connect us all globally and demonstrate to our colleagues, customers, suppliers and shareholders that we are a company they can trust and count on***.

38. Among the principles in the Code is "Compliance with Laws and Regulations and Fair Dealing":

> ***The Company communicates full, fair, accurate, timely and understandable disclosure in all of our public communications and in the information that we provide to the Securities and Exchange Commission, NASDAQ and the public***. Our associates must carry out their responsibilities in compliance with all laws applicable to the company, including ***securities*** and insider trading laws.

39. As discussed below, Defendants violated the Code by authorizing the dissemination of—and in Smith's case, signing—the Proxy with materially false and misleading misrepresentations and omissions.

**C. ODP Retains J.P. Morgan to Help Evaluate Proposals From Potential Counterparties to Acquire ODP**

40. In the fall of 2024, ODP began fielding inquiries from potential counterparties interested in acquiring ODP. In December 2024, a financial investor referred to in the Proxy as "Party C" reached out to ODP on an unsolicited basis to express interest in acquiring ODP, although it did not submit a formal bid for ODP at that time. According to the Section 220 Documents, Party C was [redacted]

[redacted].

41. On December 2, 2024, Timothy Fazio, a Managing Partner of Atlas, contacted ODP on an unsolicited basis to request a discussion.

42. On December 5, 2024, Smith, Max Hood (ODP's co-Chief Financial Officer), and Adam Haggard (ODP's co-Chief Financial Officer), spoke by phone with Fazio, who disclosed that Atlas had acquired a significant investment in ODP, and was interested in acquiring ODP. Atlas did not submit a formal bid at that time.

43. On December 16, 2024, ODP executed a confidentiality agreement with Atlas, in which Atlas represented that together with its affiliates, it beneficially owned approximately 2.61% of ODP's common shares, and had economic exposure to an additional 314,368 ODP common shares through derivative securities (which represented approximately 1% of ODP's common shares). Following execution of the confidentiality agreement, ODP made certain non-public information available to Atlas.

44. On December 19, 2024, ODP entered into an engagement letter retaining J.P. Morgan to serve as ODP's lead financial advisor in connection with ODP's consideration of potential strategic alternatives. The Proxy explained that ODP engaged J.P. Morgan because of, among other things, "J.P. Morgan's experience and expertise as a financial advisor in a wide variety of transactions, and J.P. Morgan's *qualifications and experience advising, and familiarity with, companies operating in the industries in which ODP operates*." Thus, J.P. Morgan's ability to analyze companies comparable to ODP was a material factor motivating ODP to retain J.P. Morgan.

45. Later the same day, Atlas participated in a due diligence session with ODP executives, and David Bleisch, a former ODP executive who advised ODP during the sales process.

46. From December 2024 through February 2025, ODP shared certain non-public information with Atlas under their confidentiality agreement, and ODP management and Atlas participated in several additional due diligence sessions.

### D. <u>Atlas Submits an Initial Bid to Acquire ODP for $30.00 Per Share in Cash</u>

47. On February 10, 2025, ODP's stock price closed at $20.39 per share.

48. On February 11, 2025, Atlas sent Smith an initial bid (the "February Atlas Proposal") to acquire ODP for $30.00 per share in cash. Smith shared the February Atlas Proposal with the Board, J.P. Morgan, and ODP's legal advisor, Simpson Thacher.

49. On February 12, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the February Atlas Proposal. J.P. Morgan's presentation summarized the February Atlas Proposal and various preliminary financial analyses performed by J.P. Morgan (albeit without the benefit of projections from ODP management, which were only prepared later). The presentation included a slide titled "Trading Metrics" that, absent projections from ODP management, was initially designated "For Reference Only," and compared trading multiples of ODP to other publicly-traded specialty retail and B2B supply companies comparable to ODP, at current stock prices, including FV/2025E EBITDA, and FV/2026E EBITDA.[2]

50. According to the minutes, at the conclusion of the meeting, the Board instructed

---

[2] In J.P. Morgan's slides, "E" is an acronym for "Estimated;" "EBITDA" is an acronym for "Earnings Before Interest, Taxes, Depreciation and Amortization;" and "FV" is an acronym for "Firm Value." J.P. Morgan calculates Firm Value as a company's equity value, plus total debt, minus cash and cash equivalents, and certain other adjustments. EBITDA is a financial metric that strips away certain non-cash accounting charges, as well as interest and taxes, to show a company's core profitability independent of its tax rates, and how the company finances its operations. EBITDA thus enables an apples-to-apples method of valuing comparable companies independent of their tax rates, and how each company finances its operations, by examining each company's Firm Value as a multiple of current and estimated EBITDA.

ODP management to continue to work with J.P. Morgan to evaluate the February Atlas Proposal, and to prepare updated projections in the form of a 5-year Long Range Plan for 2025 through 2029, for J.P. Morgan's use in its financial analyses. The Proxy indicates that the Board also instructed J.P. Morgan to convey to Atlas the Board's expectation that Atlas would increase its valuation of ODP, and that in the meantime, ODP would continue to permit Atlas to access non-public information under their confidentiality agreement. On February 13, 2025, J.P. Morgan conveyed the Board's position to Atlas.

### E. The Board Authorizes ODP Management to Jointly Engage an Economist With [redacted] to Evaluate the Antitrust Risks of an Acquisition of ODP By [redacted]

51. On February 19, 2025, Smith and Schoppert were contacted by a financial advisor for an investment firm referred to in the Proxy as "Party D," indicating that Party D sought a meeting to discuss a potential transaction. According to the Section 220 Documents, Party D was [redacted]

52. On February 21, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the discussions with Atlas and the overture from [redacted] ODP management also reviewed financial projections for ODP for fiscal years 2025 through 2029, prepared by ODP management (the "February Projections"). The Board directed ODP management to provide the February Projections to J.P. Morgan in connection with its preliminary financial analysis of the February Atlas Proposal, and to Atlas in connection with its evaluation of a potential transaction. The minutes of the meeting on February 21, 2025, do not reflect that the Board reached any conclusion regarding a response to [redacted] overture.

53. On March 6, 2025, Atlas discussed the February Projections with ODP management, Bleisch, and J.P. Morgan. That same day, Smith and Bleisch had a call with

[redacted] during which [redacted] representative expressed interest in an all-cash acquisition of ODP that would combine ODP with [redacted]. No valuation was discussed.

54. On March 10, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of discussions with Atlas, and the conversation with [redacted] on March 6, 2025. According to the minutes, Bleisch and Smith advised the Board that after [redacted] had "outlined certain potential terms related to antitrust clearance" that had been unacceptable to ODP in 2022, Bleisch and Smith "had discussed with [redacted] the possibility of conducting a [Joint Antitrust Review] using an outside economist and outside legal counsel to assess the current antitrust clearance landscape as it would relate to a potential acquisition of the Company by [redacted]." After discussion, the Board determined that the Joint Antitrust Review "*would be in the best interests of shareholders* and directed management to engage in the [Joint Antitrust Review] with the assistance of outside advisors, including outside legal counsel."

55. The economist jointly retained by ODP and [redacted] was an expert at CRA, a leading global consulting firm with over 1,000 consultants that offers economic, financial, and strategic expertise to major law firms, corporations, accounting firms, and governments around the world.[3] ODP also separately engaged its own economist from Econic Partners ("Econic"), a leading economic consulting firm that advises corporations, law firms, governments, and financial institutions concerning antitrust, regulatory, litigation, and policy matters, and has over 300 experts and consultants, according to its LinkedIn profile.[4]

56. On March 14, 2025, ODP and [redacted] entered into a confidentiality agreement.

---

[3] *See* https://www.crai.com/cra-careers/essential-facts/.

[4] *See* https://www.linkedin.com/company/econic-partners-llc/.

The Board, however, never authorized ODP management to provide any confidential information to [redacted]. Meanwhile, ODP continued to provide non-public information to, and hold due diligence sessions with, Atlas and other potential counterparties throughout the sales process.

57. On April 2, 2025, President Trump announced wide-ranging tariffs on U.S. trading partners, and global financial markets experienced significant volatility.

58. On April 3, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of discussions with Atlas. Bleisch advised that discussions with Atlas had been delayed. According to the minutes, Bleisch also provided an update to the Board concerning the status of the Joint Antitrust Review with [redacted] "previously authorized by the Board."

59. On April 7, 2025, Atlas informed Smith and Bleisch that, due to a number of factors including uncertainty around the impact of potential changes in tariff policies, as well as certain financial assumptions underlying the February Atlas Proposal that were purportedly not supported by the February Projections, Atlas had determined to pause its evaluation of a potential transaction with ODP. Atlas orally advised, however, that it would be willing to proceed with its evaluation on the basis of a bid to acquire ODP for $21.25 per share in cash (the "April Atlas Proposal").

60. On April 8, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the above development with Atlas. The Board instructed ODP management to communicate to Atlas that discussions of a potential transaction would be paused in light of the reduced valuation reflected in the April Atlas Proposal. The Board also discussed the possibility of authorizing J.P. Morgan to proactively reach out to certain additional counterparties that may be interested in acquiring ODP, but determined to defer such outreach at that time in part based on the uncertainty as to the expected impact of the recent tariff

announcements. Finally, according to the minutes, Bleisch updated the Board concerning the Joint Antitrust Review being conducted by ODP and [redacted].

61. On April 10, 2025, Bleisch advised Atlas of the Board's decision to pause discussions with Atlas in light of the reduced valuation reflected in the April Atlas Proposal.

62. On April 16, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance. They first discussed ODP's preliminary Q1 2025 financial results, which had not yet been made public, but which the Board agreed to provide to Atlas. The minutes reflect that Bleisch then advised the Board that an initial draft of the Joint Antitrust Review being conducted with [redacted] was on track to be delivered later in the month. Finally, the Board authorized J.P. Morgan to undertake a market check by reaching out to a list of other potential counterparties most likely to be interested in and able to expeditiously proceed with a potential acquisition of ODP.

63. On April 22, 2025, J.P. Morgan began reaching out to a group of 24 potential counterparties. Of those 24 potential counterparties, 14 executed confidentiality agreements with ODP. Thereafter, ODP management held due diligence sessions with those 14 potential counterparties, and provided them with the February Projections.

64. On April 30, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of discussions with Atlas. According to the minutes, ODP's Chief Legal Officer, Sarah Hlavinka, updated the Board concerning "the preliminary work of the economist hired jointly by [redacted] and ODP, as well as the economist hired separately by ODP, the two economists' respective initial views as to the likelihood of approval of a potential transaction, and the fact that the initial antitrust analysis suggested that a 'second request' would be expected." Hlavinka advised that the "economists were expected to

provide a more fulsome read-out in mid-May."

F. **<u>ODP Reports Strong Q1 2025 Results</u>**

65. On May 7, 2025, before the markets opened, ODP reported its first quarter 2025 financial results. In the press release announcing the results, Smith expressed optimism:

> ***We are off to a better start to the year, with our overall performance reflecting positive momentum and improving trends in the first quarter***. ***We delivered solid operational results as we continued to maintain laser focus on the core business, resulting in EBITDA improving sequentially and free cash flow increasing meaningfully over last year. Our consumer division was a key contributor, driving stronger top-line trends, achieving sequential margin improvements, and continuing to deliver solid cash flow***.
>
> In our B2B distribution business, while the market remained soft, we're making significant strides beneath the surface. We've recently secured some of the most meaningful new business contracts in our history, including our recently announced agreement with CoreTrust, and the pace of customer onboarding is beginning to accelerate, positioning us to drive stronger monthly performance trends.
>
> Additionally, we're making significant underlying progress on our efforts to serve the hospitality industry, including forging key supplier relationships, preparing our inventory and sales force, and actively engaging with potential new customers. Through our recently announced partnership with a leading hospitality management company, we're laying the foundation to serve the over 15,000 members within this buying group, and we are having positive discussions with other major industry participants. We believe our progress has us on track to begin driving more meaningful results in the hospitality segment beginning in the second half of this year.
>
> In our supply chain business, Veyer continued to deliver exceptional results, achieving over 85% revenue growth from third-party customers and adding significant new accounts to its portfolio.
>
> Overall, while there is still substantial work ahead, we are encouraged by the progress we're making. We're also closely monitoring the tariff environment, and while we are not immune to shifts in policy, we have taken actions to help mitigate potential impacts. ***As we move forward, we remain focused on executing the foundational strategies required to drive success and are confident in our ability to capitalize on the opportunities before us, positioning ODP for sustained, profitable growth in the future. And considering our strong balance sheet, valuable asset base, supply chain and distribution capabilities, and cash flow profile, we believe ODP offers a unique and compelling value proposition for shareholders***.

66. During an earnings call later that day, when asked about the impact of tariffs, Smith

explained how "we've done a really good job of mitigating tariff exposure," and quantified that "[w]e believe we've mitigated *almost all* the impact."

67. Nevertheless, on May 16, 2025, Atlas advised Smith that it would only be willing to reengage in the process of evaluating a potential transaction on the basis of acquiring ODP for $21.25 per share in cash ("May Atlas Proposal").

### G. The CRA Economist Jointly Retained by [redacted] and ODP Initially Concludes That There is a 50-60% Chance That Regulators Would Approve a Sale of ODP to [redacted]

68. On May 27, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the sales process. According to the minutes, Hlavinka updated the Board concerning the "work done by both CRA, the economist jointly engaged by [redacted] and ODP, and Econic, the economist engaged separately by ODP, related to antitrust issues associated with a possible transaction with [redacted]." ***Hlavinka noted that "CRA had now indicated that a transaction with*** [redacted] ***would have a 'high likelihood' of being approved, and had verbally indicated that this represented approximately 50-60% likelihood of approval***, while Econic was more conservative with respect to the likelihood of approval." According to the minutes, a discussion ensued, and the Board "considered whether to instruct its advisors to revert to [redacted] to request clarity on [redacted] position with respect to valuation, proposed regulatory efforts, and [a] proposed regulatory termination fee in a potential transaction."

69. The Proxy misstates the minutes with respect to the discussion concerning the Joint Antitrust Review at the Board meeting on May 27, 2025 ("May 27 Board Meeting"). Rather than disclose the initial conclusion of the economist jointly engaged by ODP and [redacted] that a sale of ODP to [redacted] had a "high likelihood" of approval, which represented "approximately 50-60% likelihood of approval," the Proxy omits that conclusion, and states only that Hlavinka "updated

the Board on the results of the antitrust review relating a potential transaction with [redacted], *including the identification of significant antitrust risk.*" But as noted, as per the minutes of the May 27 Board Meeting, only the Econic economist separately retained by ODP had concluded that the likelihood of approval was less than 50-60%, while the CRA economist jointly retained by ODP and [redacted] had concluded that there was a "high likelihood" of approval, representing "approximately 50-60% likelihood of approval." By stating only that the antitrust review had identified "significant antitrust risk," and omitting the conclusion of the expert CRA economist jointly retained by ODP and [redacted] that the odds were at or better than 50% that regulators would approve such a deal, the Proxy mislead ODP stockholders concerning the antitrust risk posed by a sale of ODP to [redacted], and the likelihood of regulatory approval of such a sale.

70. Rather than misleading ODP stockholders by omission, the Proxy should have disclosed the CRA economist's initial expert opinion to ODP stockholders so that they could decide for themselves how much weight to assign to that opinion when deciding how to vote. Indeed, as discussed below, there were at least two ODP investors who—based on the deregulatory agenda of the new Trump Administration—aligned with the CRA economist's view that the likelihood of regulatory approval of a sale of ODP [redacted] was high. Thus, the CRA economist's expert opinion was a crucial viewpoint that Defendants were obligated to share with ODP stockholders to fully inform their votes.

### H. J.P. Morgan Presents Three Principal Financial Analyses to Illustrate ODP's Potential Value, Including Two Trade Multiple Analyses Based on Multiples of Firm Value to Estimated Adjusted EBITDA in 2025 and 2026

71. After discussing the status of the Joint Antitrust Review at the May 27 Board Meeting, the Board discussed the status of discussions with Atlas, and J.P. Morgan's market check. J.P. Morgan then reviewed a presentation showing its preliminary financial analyses (which referred to ODP

as "Ocean"). The minutes reflect that the Board and J.P. Morgan discussed the presentation, including "certain assumptions used in the analyses and *certain valuation methodologies*."

72. As per the screenshot below, J.P. Morgan's presentation included a slide ("Slide 8") titled "Ocean [i.e., ODP] Preliminary Valuation Analysis" summarizing the outcome of three valuation analyses—*none* of which were designated "For Reference Only":

(i) a Trade Multiple Analysis using a reference range of multiples of FV/2025E Adjusted EBITDA of comparable specialty retail and B2B companies (which indicated a standalone value for ODP of $15.50 to $44.00 per share with a midpoint of $29.76 per share) ("*FV/2025E Adjusted EBITDA Multiple Analysis*");

(ii) a Trade Multiple Analysis using a reference range of multiples of FV/2026E Adjusted EBITDA of comparable specialty retail and B2B companies (which indicated a standalone value for ODP of $15.25 to $40.00 per share with a midpoint of $27.69 per share) ("*FV/2026E Adjusted EBITDA Multiple Analysis*"); and

(iii) a DCF Analysis indicating a standalone value for ODP of $21.75 to $28.50 per share with a midpoint of $24.62 per share:




73. As per the screenshot above, Slide 8 stressed the "Midpoint Per Share" emerging from the two Trade Multiple Analyses and the DCF Analysis as key data points for the Board's consideration when assessing ODP's value. Slide 8 also identified two other analyses designated "For Reference Only" consisting of (i) three analyst price targets (which another slide in the presentation identified as $17.00, $35.00 and $41.00 per share), and (ii) a 52-week high/low range of $11.85 per share to $43.31 per share.

74. J.P. Morgan's presentation also included a slide ("Slide 10") titled "Trading and Operating Metrics of Public Companies" that compared trading multiples of ODP to other publicly-traded specialty retail and B2B supply companies comparable to ODP, at current stock

prices, including FV/2025E Adjusted EBITDA, and FV/2026E Adjusted EBITDA (with some *but not all* of the comparable companies designated as "For Reference Only"), thus evidencing the significance of the Trade Multiple Analyses to J.P. Morgan's evaluation:




75. Finally, J.P. Morgan's presentation included a slide titled "Analysis at Various Prices," that showed, among other things, the implied FV/2025E Adjusted EBITDA and FV/2026E Adjusted EBITDA multiples for ODP at various sales prices, thus further evidencing the significance of the Trade Multiple Analyses to J.P. Morgan's evaluation (see bottom of screenshot):

## Analysis at Various Prices

Updated Proposal[1]

2/11 Aruba Proposal

| $mm, except per-share | Metric | Current | Analysis at Various Prices $21.25 | $22.50 | $25.00 | $27.50 | $30.00 |
|---|---|---|---|---|---|---|---|
| **Share price** | | **$16.15** | | | | | |
| Premium to 52-week high (07/31/2024) | *$43.31* | (63%) | (51%) | (48%) | (42%) | (37%) | (31%) |
| Premium to 52-week low (04/08/2025) | *$11.85* | 36% | 79% | 90% | 111% | 132% | 153% |
| Premium to current share price (05/20/2025) | *$16.15* | - % | 32% | 39% | 55% | 70% | 86% |
| Premium to 30-day VWAP | *$14.80* | 9% | 44% | 52% | 69% | 86% | 103% |
| Premium to 60-day VWAP | *$14.69* | 10% | 45% | 53% | 70% | 87% | 104% |
| (x) Diluted Shares Outstanding[2] | | 30.5 | 30.5 | 30.5 | 30.5 | 30.5 | 30.5 |
| **Equity Value** | | **$493** | **$648** | **$686** | **$763** | **$839** | **$915** |
| (+) Debt | | 262 | 262 | 262 | 262 | 262 | 262 |
| (-) Cash & Equivalents | | (185) | (185) | (185) | (185) | (185) | (185) |
| **Firm Value** | | **$570** | **$725** | **$763** | **$840** | **$916** | **$992** |
| **Implied multiples** | | | | | | | |
| FV / LTM Jun-30 Adj. EBITDA[3] | *$251* | 2.3x | 2.9x | 3.0x | 3.3x | 3.7x | 4.0x |
| FV / 2025E Adj. EBITDA | *$219* | 2.6x | 3.3x | 3.5x | 3.8x | 4.2x | 4.5x |
| FV / 2026E Adj. EBITDA | *$216* | 2.6x | 3.4x | 3.5x | 3.9x | 4.2x | 4.6x |

Source: Company Filings, Management Forecast, FactSet as of 05/22/2025
Note: [1] Verbal proposal; [2] Assumes 30.1mm basic shares outstanding as of 03/29/2025 and 0.427 diluted restricted stock units per Ocean management; [3] LTM 06/30/2025 Adj. EBITDA calculated as latest three quarters as reported and 25% of 2025E per management projections;

J.P.Morgan PROJECT OCEAN 15

76. At the conclusion of the meeting, the Board directed ODP management to work with ODP's advisors to prepare a response to [redacted] for the Board's review seeking clarity on [redacted] position with respect to valuation, proposed regulatory efforts, and a proposed regulatory termination fee in a potential transaction.

77. On May 28, 2025, J.P. Morgan requested that potential counterparties interested in acquiring ODP submit a non-binding written indication of interest by June 10, 2025.

78. On May 29, 2025, [redacted] reached out to J.P. Morgan to indicate that [redacted] remained interested in a potential transaction with ODP. No valuation was discussed.

79. On June 6, 2025, Lazard Frères & Co. LLC ("Lazard"), Atlas's financial advisor, reached out to J.P. Morgan to indicate that Atlas was interested in re-engaging with ODP regarding

a potential acquisition of ODP. At the direction of the Board, J.P. Morgan conveyed to Lazard that ODP would likely expect Atlas to significantly increase its proposed valuation relative to the May Atlas Proposal before re-engaging in discussions with Atlas.

80. On June 9, 2025, ODP management and J.P. Morgan held a due diligence discussion with a financial investor referred to in the Proxy as "Party F." The Section 220 Documents indicate that "Party F" is [redacted].

**I. [redacted] Offers $24.00 Per Share in Cash for ODP, Which Exceeds the Prior Bids of Atlas and Other Competing Bidders**

81. On June 10, 2025, ODP received written proposals to acquire ODP from counterparties referred to in the Proxy as "Party G" and "Party H." According to the Section 220 Documents, Party G is [redacted], and Party H is [redacted].

82. Party G's bid was for $20.43 to $22.26 per share ("June Party G Proposal"), and Party H's bid was for $18.50 to $21.00 per share ("June Party H Proposal"). The Proxy, however, failed to disclose the amount of either bid—or the amounts of any of the other subsequent bids submitted by other potential counterparties during the sales process. This lack of transparency in the Proxy made it extremely difficult for ODP stockholders to follow the progression of the bidding process.

83. On June 11, 2025, ODP received a written proposal ("June Party F Proposal") from Party F to acquire ODP for $22.50 per share in cash, which was the highest bid to date. The Proxy failed to disclose the amount of Party F's bid. Instead, it stated only that "Party F's indication of interest . . . *reflected the highest valuation*, which was in excess of the May Atlas [Proposal]."

84. On June 12, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the sales process. According to the minutes, the Board determined to send a letter to [redacted] requesting a formal indication of interest and

proposed regulatory terms by June 23, 2025, as a condition to the disclosure of confidential information to [redacted].

85. J.P. Morgan then discussed the bids received from Parties F, G and H. In response, the Board instructed J.P. Morgan to advise those potential counterparties that their bids were inadequate, and that improved bids should be submitted. J.P. Morgan further advised the Board that certain themes emerging in J.P. Morgan's conversations with potential bidders included concerns about Amazon as a competitor. [redacted] growing competition from Amazon increased the likelihood that regulators would approve a sale of ODP [redacted].

86. After the Board meeting on June 12, 2025, Schoppert sent a letter to [redacted]

87. On June 17, 2025, Party C submitted a non-binding written indication of interest for an all-stock merger of ODP with a retail business that Party C owned, in a transaction in which ODP would remain a publicly traded company controlled by Party C, and ODP stockholders would continue to hold shares of ODP common stock in the controlled company and would not receive any cash consideration.

88. On June 20, 2025, ODP provided Parties F, G and H with access to additional non-public information.

89. On June 23, 2025, [redacted] responded to Schoppert's letter with a proposal to acquire ODP for $24.00 per share in cash ("June [redacted] Proposal"). [redacted] bid was the highest price offered to acquire ODP as of June 23, 2025—$1.50 per share higher than the next highest bid of $22.50 under the June Party F Proposal. Yet, the Proxy failed to disclose this fact even though it had disclosed that the June Party F Proposal had offered the highest valuation when it was submitted. Instead, the Proxy simply states that "[o]n June 23, 2025, Party D submitted to

Ms. Schoppert a non-binding written indication of interest for an acquisition of 100% of the common stock of ODP for cash." ***Thus, ODP stockholders were unaware that, as of June 23, 2025,*** [redacted] ***bid was the highest offer as of that date***.

90. Additionally, the June [redacted] Proposal addressed the Joint Antitrust Review:

> As you are aware, you and we have commissioned a joint economic study by Charles River & Associates ("CRA") to assess the regulatory implications of a potential transaction between ODP and [redacted] . . . Based on nearly two months of detailed analysis using data from both ODP and [redacted], CRA concluded that "*on the basis of the economic antitrust assessment the deal has a high likelihood of achieving regulatory clearance*."

91. Given the conclusion reached by the CRA economist, the June [redacted] Proposal proposed that (i) deal documentation should not include a termination fee or reverse termination fee payable to or by either party, and (ii) both parties would use their reasonable best efforts to obtain regulatory clearances, including defending litigation, if necessary, and subject to disposal of assets up to a level to be agreed upon. [redacted] further advised that the transaction would not be subject to any financing condition.

92. The June [redacted] Proposal closed by advising that "we are prepared to dedicate the necessary resources to deliver the Board a binding proposal *as soon as we are permitted access to the Company to complete our diligence.*" Thus, [redacted] expressly requested access to further due diligence to improve its proposal. Such due diligence was never provided.

93. The Proxy did not disclose any of the foregoing contents of the June [redacted] Proposal.

94. Also on June 23, 2025, a financial investor referred to in the Proxy as "Party J" contacted J.P. Morgan to express interest in receiving non-public information regarding ODP and potentially submitting an indication of interest. According to the Section 220 Documents, Party J is [redacted].

95. On June 24, 2025, ODP management held a due diligence session with Atlas.

96. On June 26, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the sales process. The attendees first discussed the June [redacted] Proposal. According to the minutes, the Board was dissatisfied with the June [redacted] Proposal for various reasons, including because it (i) did not propose any specific regulatory remedies that [redacted] would be willing to accept ("Regulatory Remedy Issue"), and (ii) indicated that [redacted] was unwilling to accept any regulatory termination fee payable to ODP if regulatory approvals could not be obtained ("Regulatory Fee Issue"). But rather than authorize ODP's management and advisors to continue to negotiate with [redacted]—especially given that [redacted] had submitted the highest bid to date—the Board determined to advise [redacted] that the Board did not think it was in the best interests of ODP and its stockholders to provide access to non-public confidential information to [redacted], or to continue to explore a potential transaction with [redacted].

97. The Board also determined that the Party C Proposal was not in the best interests of ODP and its stockholders because it was not structured as a cash acquisition.

98. Finally, the Board discussed the status of discussions with Atlas, and Parties F, G and H.

99. On June 30, 2025, Schoppert conveyed the Board's response to the June [redacted] Proposal.

100. Between July 1 and July 2, 2025, ODP management held due diligence sessions with Parties F, G and H, and on July 2, 2025, J.P. Morgan sent letters to Parties F, G and H requesting revised bids by July 17, 2025.

101. On July 8, 2025, Atlas submitted a revised bid to acquire ODP for $23.25 per share

in cash (the "July Atlas Proposal"), and on July 9, 2025, at the direction of the Board, J.P. Morgan sent a process letter to Atlas requesting a revised bid by July 17, 2025.

102. On July 10, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the sale process. According to the minutes, Bleisch advised the Board that after [redacted] received Schoppert's letter on June 30, 2025, [redacted] banker, Guggenheim, had reached out to Bleisch, and Bleisch and Smith had subsequently had a conversation with Guggenheim during which it "indicated that [redacted] could propose improved terms," and requested a conversation with a decision maker at ODP. Bleisch and Smith responded that any updates from [redacted] should be provided in writing for consideration by the Board. None of this was disclosed in the Proxy.

103. Thereafter, the Board discussed the status of discussions with Atlas, and the discussions with and due diligence processes being undertaken by Parties F, G, H and J. Party F subsequently dropped out from the bidding due to its inability to meet the Board's timeline to conduct due diligence.

104. Undisclosed in the Proxy, on July 15, 2025, [redacted] wrote to Schoppert to reiterate its bid to acquire ODP for $24.00 per share ("July [redacted] Proposal"). [redacted] letter also addressed the Regulatory Remedy and Regulatory Fee Issues by proposing that ODP and [redacted] replicate and proceed with the regulatory framework agreed upon by ODP and [redacted] in 2015, which included payment of a fee to ODP upon termination of a deal due to antitrust issues.

105. On July 15-16, 2025, Atlas met with ODP management for additional due diligence sessions.

106. On July 17, 2025, Atlas submitted a revised bid to acquire ODP for $23.50 per share in cash ("Revised July Atlas Proposal"), while Party G submitted a revised bid to acquire

ODP for $24.00 per share ("July Party G Proposal"). The Proxy, however, did not disclose the amount of Party G's bid. Instead, it stated only that Party G's revised bid was "for an amount in cash per share in excess of the Revised July Atlas Proposal." The Proxy did not mention that [redacted] bid was still the highest offer alongside the bid in the July Party G Proposal.

**J. The CRA Economist Jointly Retained by [redacted] and ODP Increases Its Estimate of the Likelihood of Regulatory Approval of a Sale of ODP to [redacted] to 70-80%**

107. On July 22, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the sale process. According to the minutes, Hlavinka reminded the Board that (i) CRA had "previously conducted a preliminary economic study based on a joint engagement by [ODP] and [redacted] to assess the regulatory implications of a potential transaction between ODP and [redacted] and had concluded that the transaction had a 'high likelihood' of success," and (ii) "CRA, in a conversation among CRA and ODP's and [redacted] respective legal counsel, had suggested that a 'high likelihood' likely corresponded to a 50-60% chance of achieving clearance." Hlavinka then advised the Board that, prior to sending the July [redacted] Proposal, "[redacted] had unilaterally contacted CRA and asked CRA to reassess its conclusion, and CRA had determined that *a 'high likelihood' represented a 70-80% chance of obtaining regulatory approval*, but had not otherwise revised its analysis." Hlavinka further advised the Board that ODP's advisors, including the economist from Econic engaged separately by ODP, "had not altered their respective conclusions with respect to the likelihood of the transaction achieving clearance, which was more conservative than the conclusion presented by CRA." Based on this update, and the contents of the July [redacted] Proposal, the Board determined that rather than further negotiate with [redacted] it continued to "not be in the best interests of the Company and its shareholders to explore a potential transaction with [redacted] at

this time." The Board then directed management to prepare a draft response for Schoppert to send to [redacted]

108. The Proxy did not disclose any of the information concerning the Joint Antitrust Review shared by Hlavinka with the Board at the meeting on July 22, 2025 ("July 22 Board Meeting"), including that the CRA economist jointly retained by ODP and [redacted] had increased its estimate of the likelihood that regulators would approve a sale of ODP to [redacted] to 70-80%. Instead, the Proxy simply stated only that the Board "directed management to communicate to Party D the ODP Board's continuing concerns regarding antitrust risk and its view that the Party D proposal did not allocate such risk in a manner that was acceptable to the ODP Board." ***Thus, when they voted, ODP stockholders were unaware that while ODP's own economist continued to differ, the CRA economist jointly retained by ODP and*** [redacted] ***to undertake the Joint Antitrust Review had opined as of July 22, 2025, that a sale of ODP to*** [redacted] ***had a 70-80% chance of obtaining regulatory approval***.

109. There is no question that ODP stockholders would have considered the updated quantification of the likelihood of approval from the CRA economist to be highly material since it indicated that, according to the expert economist jointly retained by ODP and [redacted] a sale of ODP to [redacted] was a viable strategic alternative with a very high likelihood of regulatory approval. By stating only that the Board had "continuing concerns regarding antitrust risk," and omitting the conclusion of the expert CRA economist that the likelihood of regulatory approval was 70-80%, the Proxy mislead ODP stockholders concerning the difference of opinion concerning the antitrust risk posed by a sale of ODP to [redacted]

110. Rather than misleading ODP stockholders by omission, the Proxy should have disclosed the CRA economist's revised expert opinion of a 70-80% likelihood of regulatory

approval to ODP stockholders so that they could decide for themselves how much weight to assign to that opinion when deciding how to vote. Indeed, as discussed below, there were at least two ODP investors who—based on the deregulatory agenda of the new Trump Administration—agreed with the CRA economist's view that the likelihood of regulatory approval of a sale of ODP [redacted] was high. Thus, the CRA economist's opinion was a crucial viewpoint that Defendants were obligated to share with ODP stockholders to fully inform their votes.

### K. J.P. Morgan Again Presents Three Principal Financial Analyses to Illustrate ODP's Potential Value, Including the Two Trade Multiple Analyses Based on Firm Value and Adjusted EBITDA Estimates

111. After the Board completed its discussion concerning [redacted] at the July 22 Board Meeting, J.P. Morgan shared a presentation showing its updated preliminary financial analyses. The minutes reflect that the Board and J.P. Morgan extensively discussed the presentation, including the assumptions and valuation methodologies used in the analyses.

112. As per the screenshot below, the presentation included a slide ("Slide 8") titled "Ocean [i.e., ODP] Preliminary Valuation Analysis" summarizing the outcome of three valuation analyses—*none* of which were designated "For Reference Only" by J.P. Morgan:

(i) a Trade Multiple Analysis using a reference range of multiples of FV/2025E Adjusted EBITDA of comparable specialty retail and B2B companies (which indicated a standalone value for ODP of $14.75 to $44.00 per share with a midpoint of $29.36 per share);

(ii) a Trade Multiple Analysis using a reference range of multiples of FV/2026E Adjusted EBITDA of comparable specialty retail and B2B companies (which indicated a standalone value for ODP of $14.50 to $40.00 per share with a midpoint of $27.26 per share); and

(iii) a DCF Analysis indicating a standalone value for ODP of $20.00 to $26.66 per share with a midpoint of $22.66 per share:




113. As per the screenshot above, Slide 8 stressed the "Midpoint Per Share" emerging from the Trade Multiple Analyses and the DCF Analysis as key data points for the Board's consideration when assessing ODP's value. Slide 8 also identified two other analyses separately designated "For Reference Only" consisting of (i) three analyst price targets (which another slide in the presentation identified as $17.00, $35.00 and $41.00 per share), and (ii) a 52-week high/low range of $11.85 per share to $43.31 per share.

114. J.P. Morgan's presentation also included a slide titled "Trading Metrics and Operating Metrics of Public Companies" that compared trading multiples of ODP to other publicly-traded specialty retail and B2B supply companies comparable to ODP, at current stock

prices, including FV/2025E Adjusted EBITDA, and FV/2026E Adjusted EBITDA (with some *but not all* of the comparable companies designated as "For Reference Only"), thus reinforcing the significance of the Trade Multiple Analyses to J.P. Morgan's evaluation:




115. At the conclusion of the July 22 Board Meeting, the Board determined that it was not in the best interest of ODP and its stockholders at such time to pursue a potential transaction with Atlas or Party G at the valuations reflected in their respective proposals. But unlike with respect to [redacted] the Board instructed Smith and Bleisch to re-engage with Atlas and Party G after ODP announced its Q2 2025 results in early August, to determine whether Atlas and Party G would be willing to improve their bids.

116. On July 28, 2025, Schoppert sent a letter to [redacted] responding to the July

[redacted] Proposal.

### L. ODP Reports Strong Q2 2025 Results

117. On August 6, 2025, ODP reported its second quarter 2025 financial results. In the press release announcing the results, Smith continued to express optimism:

> ***Our team's disciplined execution and focus on operational excellence <u>resulted in another quarter of improved performance</u>. During the quarter, we drove improved revenue trends and delivered solid operating results, highlighted by stronger adjusted free cash flow generation. These results reflect ongoing improvements across both our consumer and B2B businesses***.
>
> In our consumer segment, we meaningfully improved same-store sales trends versus last year, underscoring the effectiveness of our targeted sale strategies and strong value proposition. ***Meanwhile, in our B2B distribution business, we achieved approximately a 200-basis point improvement in year-over-year revenue trends, driven by stronger sales traction with new customers and early contributions from our expansion into the hospitality sector. Sales trends improved month over month throughout the quarter, improving our position as we head into the second half of the year***.
>
> ***On a consolidated basis, our strong performance resulted in solid adjusted EBITDA and drove adjusted free cash flow more than double last year's level, further strengthening our balance sheet***.
>
> As we look to the second half of the year, we remain confident in our ability to drive continued improvement and value creation. We expect continued strength in performance in our consumer segment while driving improved revenue trends in our B2B distribution business, as we continue to onboard new customers and begin to penetrate the hospitality segment. ***Additionally, with our strong focus on cash, we expect to generate significantly higher adjusted free cash flow versus last year, further strengthening our foundation and balance sheet***. We remain committed to executing our core strategy and delivering long-term shareholder value.

118. In an earnings call later that day, Smith's prepared remarks elaborated on tariffs and ODP's free cash flow:

> Regarding the tariff environment, while we are not immune, ***we believe we are well positioned to adjust and we have taken proactive measures to position ourselves effectively to help mitigate potential impacts as the situation continues to evolve***. Supporting our outlook as we enter the second half of the year, we anticipate driving additional top line improvement at ODP Business Solutions while maintaining strong results in our retail channel.

> ***We are ahead of expectations on cash generation and now expect adjusted free cash flow to exceed $150 million for the year, further strengthening our balance sheet and liquidity*.**

119. In response to further questions, Smith advised that "we're performing well from a tariff mitigation perspective and *super pleased* with the momentum we've seen in the last 45 days from a hospitality perspective as well. For example, yesterday was our biggest day ever in the hospitality business."

120. Smith also asserted during the call that ODP's stock price at the time was outrageously low—trading at "a liquidation multiple" as he put it—which Smith asserted "isn't fair at all" given ODP's "balance sheet position . . . cash position . . . liquidity position . . . potential we have in hospitality and . . . the execution of our B2C teams," which made ODP's stock a "strong buy," in Smith's view.

**M. A Wall Street Analyst Reaffirms a Price Target of $35.00 Per Share**

121. On August 7, 2025, one of the Wall Street analysts cited by J.P. Morgan in its presentations reiterated its price target for ODP of $35.00 per share. In doing so, the analyst cited ODP's positive Q2 2025 results (as quoted by J.P. Morgan in its presentations in September 2025):

> We are *maintaining* our Outperform rating and our $35 price target on ODP shares. ***We view 2Q results as an indication of things to come for ODP***. The new hospitality agreement significantly broadens ODP's [Total Addressable Market]. Management's Project Core should result in greater operational efficiencies and "Optimize for Growth" should drive higher, more profitable revenue.

**N. The Board Continues to Rebuff [redacted]**

122. On August 7, 2025, [redacted] sent a letter ("August [redacted] Proposal") to Schoppert reiterating its bid of $24.00 per share in cash, and addressing the Regulatory Remedies and Regulatory Fee Issues.

123. Also on August 7, 2025, a financial investor referred to in the Proxy as "Party K"

contacted J.P. Morgan to express interest in acquiring ODP. According to the Section 220 Documents, Party K is [redacted].

124. On August 9, 2025, Party J submitted a bid to acquire ODP for $23.00 to $24.00 per share in cash. ("August Party J Proposal"). The Proxy, however, did not disclose the amount of the bid. Instead, it stated only that "the high point . . . was in excess of the Revised July Atlas Proposal." But the high point of the August Party J Proposal was also equal to the amount of the most recent bids under the July Party G Proposal and June [redacted] Proposal (i.e., $24.00 per share in cash). The competitive nature of [redacted] bid, as well as the progression of the bidding process overall, thus remained concealed from ODP stockholders.

125. On August 11, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of the sales process, including ongoing due diligence by Atlas and Party G. At the meeting, J.P. Morgan summarized the outstanding proposals from Atlas, and Parties G and J (but not [redacted]). J.P. Morgan's presentation also included a slide titled "Illustrative Analysis at Various Prices," which was discussed with the Board, as per the minutes. The slide showed, among other things, the implied FV/2025E Adjusted EBITDA and FV/2026E Adjusted EBITDA multiples for ODP at various sales prices, thus further evidencing the significance of the two Trade Multiple Analyses to J.P. Morgan's evaluation (see bottom of screenshot):

Board of Directors Meeting - Project Ocean Process Update

*For discussion purposes only – Preliminary analysis and subject to change*

CONFIDENTIAL

## Illustrative analysis at various prices

| $mm, except per-share | Metric | Current | Analysis at Various Prices | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | $20.00 | $22.50 | $25.00 | $27.50 | $30.00 | $32.50 |
| **Share price** | | **$19.41** | | | | | | |
| Premium to 52-week high (11/04/2024) | *$32.21* | (40%) | (38%) | (30%) | (22%) | (15%) | (7%) | 1% |
| Premium to 52-week low (04/08/2025) | *$11.65* | 64% | 69% | 90% | 111% | 132% | 153% | 174% |
| Premium to current (08/08/2025) | *$19.41* | - % | 3% | 16% | 29% | 42% | 55% | 67% |
| Premium to 30-day VWAP | *$18.42* | 5% | 9% | 22% | 36% | 49% | 63% | 76% |
| Premium to 60-day VWAP | *$17.67* | 9% | 12% | 26% | 40% | 54% | 68% | 82% |
| (x) Diluted Shares Outstanding[1] | | 33.6 | 33.6 | 33.6 | 33.6 | 33.6 | 33.6 | 33.6 |
| **Equity Value** | | **$652** | **$671** | **$755** | **$839** | **$923** | **$1,007** | **$1,091** |
| (+) Debt | | 245 | 245 | 245 | 245 | 245 | 245 | 245 |
| (-) Cash & Equivalents | | (177) | (177) | (177) | (177) | (177) | (177) | (177) |
| **Firm Value** | | **$720** | **$739** | **$823** | **$907** | **$991** | **$1,075** | **$1,159** |
| **Implied multiples** | | | | | | | | |
| FV / LTM Jun-30 Adj. EBITDA | *$244* | 2.9x | 3.0x | 3.4x | 3.7x | 4.1x | 4.4x | 4.8x |
| FV / 2025E Adj. EBITDA | *$219* | 3.3x | 3.4x | 3.8x | 4.1x | 4.5x | 4.9x | 5.3x |
| FV / 2026E Adj. EBITDA | *$216* | 3.3x | 3.4x | 3.8x | 4.2x | 4.6x | 5.0x | 5.4x |

Source: Company Filings, Management Forecast, FactSet as of 08/08/2025
Note: [1] Assumes 33.572mm of fully diluted shares outstanding (consisting of 30.084mm basic shares outstanding as of 07/30/2025 per public company filings, 1.866mm diluted restricted stock units and 1.622mm diluted performance stock units per Ocean management)

J.P.Morgan PROJECT OCEAN

7

126. Thereafter, the Board discussed the August [redacted] Proposal, and determined that it did not adequately address the Board's concerns regarding regulatory risk. But rather than further negotiate with [redacted] the Board concluded that "it continues not to be in the best interests of the Company and its shareholders to provide access to non-public information to [redacted] or to explore a potential transaction with [redacted] at this time, and that such determination should be communicated to [redacted] in writing." Thus, [redacted] never received any confidential information to allow it to improve its bid.

127. Upon further discussion concerning the remaining proposals from Atlas and Parties G and J, the Board directed Smith and Bleisch to convey to Atlas and Parties G and J that the

Board would consider $28.00 per share in cash to be an appropriate valuation for a potential transaction and to request such parties to put forth revised proposals. The Board, however, never authorized sharing this price expectation with [redacted] to determine whether [redacted] would be willing to pay $28.00 per share or more, and further address the concerns of the Board regarding Regulatory Remedies and Regulatory Fees, even though as of early August 2025, [redacted] bid of $24.00 per share remained the highest bid alongside the July Party G Proposal and August Party J Proposal. As discussed below, at least two investors opined that Sycamore could have easily justified paying $29.00 or more per share for ODP based on the tremendous synergies (>$1 billion) that could be realized from a combination of ODP and Staples (a "no brainer" for Sycamore, as one investor put it).

128. On August 12, 2025, Schoppert sent a response letter to [redacted] According to the Proxy, [redacted] "did not propose revised terms." But that statement was misleading because it implied that [redacted] did not reach out again. Indeed, the Proxy affirmatively stated that "[b]etween June 30 *and August 7, 2025*, ODP and [redacted] exchanged communications with respect to the allocation of the antitrust risk of a potential transaction," thus expressly creating the impression that [redacted] did not reach out again regarding the antitrust issue after August 7, 2025. But in fact, as discussed at the Board meeting on August 22, 2025 ("August 22 Board Meeting"), [redacted] did reach out again through its counsel to share the CRA economist's final opinion that the likelihood of regulatory approval of a sale of ODP to [redacted] was 90%.

129. On August 14, 2025, Schoppert, Smith and Bleisch had separate discussions with Parties G, J, and Atlas to convey that the Board would consider $28.00 per share in cash to be an appropriate valuation for a potential transaction and to request such parties to put forth revised proposals. As per the Board's direction, Schoppert, Smith and Bleisch did not reach out to

[redacted] to determine if [redacted] would be willing to pay $28.00 per share or more, even though as of early August 2025, Sycamore's bid of $24.00 per share remained the highest bid alongside the July Party G Proposal and August Party J Proposal.

130. Meanwhile, ODP continued to make available certain non-public diligence materials to representatives of Atlas, and Parties G and J under their respective confidentiality agreements, and to engage in due diligence sessions. No such non-public due diligence was ever made available to [redacted] even though it had signed a confidentiality agreement and requested further due diligence. Thus, throughout the sale process, [redacted] was left at a severe informational disadvantage in terms of improving its bid.

### O. Party K Submits a Bid With a Price Range of $30.00 to $31.75 Per Share in Cash

131. On August 18, 2025, Party K submitted a bid to acquire ODP for $30.00 to $31.75 per share in cash ("August Party K Proposal"). The Proxy failed to disclose the price range of Party K's bid other than to state that it "*was in excess* of the Revised July Atlas Proposal." But the Revised July Atlas Proposal was only $23.50 per share in cash. Thus, the August Party K Proposal substantially exceeded the amount of the Revised July Atlas Proposal by over 25%. Moreover, the August Party K Proposal also substantially exceeded the amount of the [redacted] Proposal (which was $24.00 per share), the July Party G Proposal (which was $24.00 per share), and the August Party J Proposal (with a high point of $24.00 per share). Thus, the Proxy continued to obfuscate the progress of the bidding.

### P. An Independent ODP Investor Opines That Synergies Justified Sycamore Paying $29.00 Per Share or Higher for ODP, While the Deregulatory Agenda of the New Trump Administration Sharply Increased the Likelihood of Regulatory Approval of a Sale of ODP to Staples

132. On August 18, 2025, an ODP investor who researches investment opportunities in

undervalued publicly-traded stocks published an article on the Substack platform concerning ODP entitled "*Buyout Imminent*." The investor ("Substack Investor") opined that were ODP to combine with [redacted] savings from synergies that could exceed $1.5 billion annually, and thus justified [redacted] (via [redacted]) offering to pay in the range of $29.00 to $34.00 per share for ODP. While [redacted] had previously only bid $24.00 per share for ODP, that was not presented as a "best and final" offer. To the contrary, [redacted] had requested further due diligence to improve its bid. But due to purported antitrust concerns, the Board refused to negotiate further with [redacted] or to provide [redacted] with access to the same confidential due diligence that had been granted to Atlas and other potential counterparties that would allow [redacted] to improve its bid.

133. According to the Substack Investor, any antitrust concerns were overblown. While he acknowledged that previous attempts by Staples to acquire ODP had been blocked by regulators, the Substack Investor opined that "***[t]his may be the most opportune moment in decades for Staples (via Sycamore) to strike.***" As the Substack Investor elaborated:

> ***With Trump back in the White House and a pro-business, deregulatory agenda taking shape, the FTC's stance on retail consolidation is expected to soften compared to the Obama and Biden years that blocked two prior Staples–ODP tie-ups.*** Regulators are now far more focused on Big Tech and digital monopolies than on legacy office-supply chains fighting for survival in a shrinking category. That creates a narrow window where the political climate, combined with ODP's rock-bottom $628 million valuation and Staples' massive synergy upside, ***makes a deal not only financially compelling but also politically possible in a way it simply wasn't before***.

### Q. The CRA Economist Jointly Retained by [redacted] and ODP Concludes That the Likelihood of Regulatory Approval of a Sale of ODP to [redacted] is 90%

134. On August 22, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of discussions with Atlas, and Parties G and J, and the new bid from Party K. Following the discussion, it was determined that all four

bidders would be asked for "best and final" bids by September 9, 2025, and that a Board meeting would be scheduled thereafter to review the bidders' responses. ODP management also presented updated projections ("Management Projections") to the Board that differed only slightly from the earlier February Projections.

135. Bleisch then advised the Board that [redacted] legal counsel had contacted Simpson Thacher to advise that the CRA economist jointly retained by ODP and [redacted] had revisited its conclusion and concluded that a sale of ODP to [redacted] "***had a 90% chance of obtaining regulatory approval***." Thus, contrary to the misrepresentation in the Proxy, [redacted] had reached out again after August 7, 2025, concerning the antitrust issue.

136. By omitting the final conclusion of the expert CRA economist jointly retained by ODP and [redacted] that the likelihood of regulatory approval of a sale of ODP to [redacted] was 90%, the Proxy concealed from ODP stockholders the existence of an expert opinion concluding that the antitrust risk posed by a sale of ODP to [redacted] was minimal. Rather than misleading ODP stockholders by omission, the Proxy should have disclosed the CRA economist's final opinion to ODP stockholders so that they could decide for themselves how much weight to assign to that opinion when deciding how to vote. Indeed, as discussed above and below, [redacted]—based on the deregulatory agenda of the new Trump Administration—agreed with the CRA economist's view that the likelihood of regulatory approval of a sale of ODP [redacted] was high. [redacted].

137. On September 2, 2025, J.P. Morgan delivered letters to Atlas, and Parties G, J and K, requesting final bids by September 10, 2025.

### R. A Well Known Value Investor Shares the View That the Deregulatory Agenda of the New Trump Administration Sharply Increased the Likelihood of Regulatory Approval of a Sale of ODP to Staples, and Tremendous Synergies Made it a "No Brainer" for Sycamore to Pay in Excess of $30.00 Per Share for ODP

138. On September 5, 2025, Whitney Tilson—a well-known value investor and former hedge fund manager—published an article concerning ODP entitled "*A deeper dive on ODP*" in his online Stansberry Research investment newsletter. In the article, Tilson shared the view of an ODP investor that there were likely multiple private equity firms bidding for ODP. Tilson also conveyed the investor's view that Sycamore was the "most logical buyer" of ODP due to the tremendous synergies (">$1 billion") that Sycamore could realize by combining ODP and Staples. Finally, Tilson explained the view of the investor that the significant change in the political environment under the new Trump Administration, as well as the new competitive threats posed by Amazon and Walmart to office supply distributors since 2021, made regulatory approval of a sale of ODP to Staples likely:

> the regulatory landscape has done a complete 180, with the harshest anti merger antitrust leadership being replaced by a very pro-business/friendly antitrust admin . . . ***I think the odds are greater than 50/50 that an ODP merger would go through***. ***They likely have a good argument in my opinion, they need to combine to be able to provide a formidable competitor to Amazon*** (and WMT) otherwise those top two are just going to bulldoze other players out of business and completely dominate, it's also a declining office supplies market so consolidation is necessary.

139. Tilson concluded that the tremendous synergies that Sycamore would realize from combining ODP and Staples provided the Board with the opportunity to use bids from other potential counterparties to secure a higher bid from Sycamore:

> I believe it makes sense that ODP runs its full process requesting bids from all types of buyers, because you want to see what you can get in a deal that incurs no regulatory risk, i.e. they will likely have buyers in the [$25 to $28 per] share range. ***They can use this as leverage to get a higher price from Staples/Sycamore in my opinion*** (i.e., why would I sell to you at $33 when I could just take the risk-free deal at [$27 to $28]? ***You need to pay me high $30s per share***, ***which is still a***

***complete no brainer for Sycamore***).

**S. The Board Decides to Proceed With Atlas**

140. On September 10, 2025, Atlas submitted a final bid to acquire ODP for $28.00 in cash per share (the "Final Atlas Proposal") while Party K submitted a final bid to acquire ODP for $24.00 per share ("Final Party K Proposal"). Parties G and J declined to submit revised bids. No one on the Board or in ODP management, or Bleisch, ever followed up again with [redacted] to determine if [redacted] was willing to bid more than $28.00 per share, [redacted]

141. On September 12, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the final bids. At the conclusion of the meeting, the Board directed ODP management and ODP's advisors to focus on the Final Atlas Proposal to determine whether agreement could be reached on acceptable terms. Thereafter, for the next week and a half, advisors to ODP and Atlas exchanged successive drafts of the Merger Agreement. During this period, Atlas continued to conduct due diligence, and participated in due diligence sessions with ODP management.

**T. A Wall Street Analyst Reaffirms a Price Target of $41.00 Per Share**

142. On September 15, 2025, another Wall Street analyst cited by J.P. Morgan in its presentations reiterated its price target for ODP of $41.00 per share. In doing so, the analyst also cited the progress shared with ODP's Q2 2025 results (as quoted by J.P. Morgan in its presentations in September 2025):

> Improving retail trends and the benefits that will be derived from the optimized for growth restructuring plan give us greater confidence in management's ability to

> manage the decline of Office Depot and maximize the cash flow of that business. ***Moreover, the B2B turnaround is progressing, and the multiple large new contracts the business has won keep us bullish on the business' trajectory***. We expect to see improving growth trends as the year progresses.

### U. The Trade Multiple Analyses and Two Out of Three Analyst Price Targets in J.P. Morgan's September 2025 Presentations Fail to Support the Fairness of the Merger Consideration

143. On September 19, 2025, the Board met, with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance, to discuss the status of negotiations with Atlas. Atlas' bid of $28.00 per share was problematic from a valuation standpoint because J.P. Morgan had previously flagged the midpoint value per share in each Trade Multiple Analysis as important data points for the Board's consideration when assessing ODP's value, and the proposed sale price fell *below* the (i) midpoint value per share of the FV/2025E Adjusted EBITDA Multiple Analysis of $31.77 per share, and (ii) midpoint value per share of the FV/2026E Adjusted EBITDA Multiple Analysis of $30.29 per share, and only exceeded the midpoint of the DCF Analysis of $26.00 per share. Thus, only the DCF Analysis supported the fairness of a sale price of $28.00 per share, while the two Trade Multiple Analyses indicated that the sale price was unfair.

144. In J.P. Morgan's earlier presentations on May 27, 2025, and July 22, 2025, neither of the Trade Multiple Analyses had been designated "For Reference Only." *See* paragraphs 72 and 112 *supra*. But since neither of Trade Multiple Analyses supported the fairness of the Merger Consideration, J.P. Morgan purported to downgrade both of them to "For Reference Only," and relied solely on the DCF Analysis to support for the fairness of the Merger Consideration:




145. The above slide also identified two other analyses as "For Reference Only" consisting of (i) three analyst price targets (which a separate slide in the presentation identified as $19.00, $35.00 and $41.00 per share), and (ii) a 52-week high/low range of $11.85 per share to $32.21 per share.

146. A separate slide addressing the analyst price targets displayed quotes from each of the analysts:

Board of Directors Meeting - Update on Project Ocean

FOR REFERENCE ONLY

CONFIDENTIAL

## Ocean broker consensus

ANALYST RECOMMENDATION PROGRESSION




SELECT ANALYST PRICE TARGETS

| Broker | Date | Recommendation | Price target ($) | Premium / (discount) to current[1] |
|---|---|---|---|---|
| Broker A | 08/07/2025 | Buy | $35.00 | *60.4%* |
| Broker B | 09/15/2025 | No Rating | $41.00 | *87.9%* |
| Broker C | 09/09/2025 | Neutral | $19.00 | *(12.9%)* |
| **Median** | | | **$35.00** | ***60.4%*** |
| **Mean** | | | **$31.67** | ***45.1%*** |

Source: Equity research and FactSet as of 09/18/2025
Note: [1] Based on 09/18/2025 closing price of $21.82

BROKER COMMENTARY

"We are **maintaining our Outperform rating and our $35 price target on ODP shares**. We view 2Q results as an indication of things to come for ODP. **The new hospitality agreement significantly broadens ODP's TAM**. **Management's Project Core should result in greater operational efficiencies** and **'Optimize for Growth' should drive higher, more profitable revenue**."

***Broker A, 08/07/2025***

"**Improving retail trends** and the benefits that will be derived from the optimized for **growth restructuring plan** give us greater confidence in management's ability to **manage the decline of Office Depot and maximize the cash flow of that business**. Moreover, the B2B turnaround is progressing, and the **multiple large new contracts the business has won keep us bullish on the business' trajectory. We expect to see improving growth trends as the year progresses**."

***Broker B, 09/15/2025***

"ODP believe that **Essendant's exit from the traditional office supplies space creates a huge opportunity**. This competitor has been doing about **~$1bn in total revenue, and roughly 70% of its sales are in traditional office supplies**. ODP believes this business is now up for grabs and it can **gain a significant portion of this market share**. In fact, ODP is starting to see these **legacy customers reach out to start discussions on establishing a relationship**."

***Broker C, 09/09/2025***

J.P.Morgan PROJECT OCEAN 8

11

147. J.P. Morgan also modified the slide entitled "Trading metrics and operating metrics of public companies" to designate the metrics for *all* of the companies on that slide as "For Reference Only" (whereas on previous slides the metrics for only some of the companies were designated "For Reference Only;" *see* paragraphs 74 and 114 *supra*), thus purporting to diminish the significance of the Trade Multiple Analyses:




148. The minutes reflect that the Board and J.P. Morgan discussed the above analyses.

149. Towards the end of the meeting, the Board discussed the possibility of an unsolicited proposal from [redacted] after a deal with Atlas was announced. Thus, the Board understood that [redacted] might still be interested in acquiring ODP. Yet, no one from ODP management or J.P. Morgan ever reached out again to [redacted] even though at least two ODP investors had concluded that [redacted] could easily justify paying $29.00 or more per share for ODP based on the massive synergies.

## V. J.P. Morgan Presents a False and Misleading Fairness Opinion to the Board

150. On September 21, 2025, the Board met to approve the Merger with ODP executives, Bleisch, J.P. Morgan and Simpson Thacher in attendance. J.P. Morgan reviewed its financial analyses of the Merger Consideration with the Board. Once again, as in its presentation on September 19, 2025, J.P. Morgan purported to downgrade the Trade Multiple Analyses to "For Reference Only" since the midpoint values per share in those analyses—$30.67 and $29.13 per share—exceeded the Merger Consideration and thus did not support the fairness of the Merger Consideration:



151. The above slide also identified two other analyses as "For Reference Only" consisting of (i) three analyst price targets (which a separate slide in the presentation identified as $19.00, $35.00 and $41.00 per share), and (ii) a 52-week high/low range of $11.85 per share to $32.21 per share.

152. The separate slide addressing the analyst price targets displayed quotes from each of the analysts:



153. J.P. Morgan also modified the slide entitled "Trading metrics and operating metrics of public companies" to designate the metrics of *all* of the companies on that slide as "For Reference Only":




W. **The Board Approves the Merger, and Subsequently Approves the Issuance of Materially False and Misleading Proxy By Order of the ODP Board**

154. Following its presentation at the Board meeting on September 21, 2025, J.P. Morgan delivered its Fairness Opinion to the Board concluding that the Merger Consideration was fair to ODP stockholders. Thereafter, in reliance on the Fairness Opinion, the Board approved the Merger, determined that the Merger was fair to and in the best interests of ODP and its stockholders, and recommended that ODP stockholders approve the Merger.

155. On September 22, 2025, ODP and Atlas executed the Merger Agreement, and announced the Merger.

156. At a Board meeting on October 9, 2025, Bleisch advised the Board that "the draft preliminary proxy statement is in progress and would be presented to the Board in the coming days." The preliminary proxy was subsequently issued by "Order of the ODP Board," signed by Defendant Smith, and filed with the SEC on October 15, 2025.

157. The preliminary proxy contained all of the materially false and misleading misrepresentations and omissions specified below in the Section in this Complaint captioned "Materially False and Misleading Misrepresentations and Omissions in the Proxy."

158. On October 27, 2025, ODP filed the Proxy with the SEC. The Proxy was issued by "Order of the ODP Board," and signed by Smith in his CEO capacity.

159. While recommending that ODP stockholders vote for the Merger, the Proxy also advised that Delaware law entitled dissenting ODP stockholders who do not vote for the Merger "to seek appraisal of the fair value of their shares of ODP common stock."

160. The Proxy stated multiple times that approval by a majority of ODP stockholders was required to consummate the Merger, including stating that (i) "[a]pproval of the proposal to adopt the merger agreement ***requires*** the affirmative vote (in person or by proxy) of the holders of ***a majority*** of the outstanding shares of ODP common stock entitled to vote as of the close of business on the record date, and (ii) "[t]he affirmative vote of the holders of a ***majority*** of the outstanding shares of ODP common stock entitled to vote as of the close of business on the record date to adopt the merger agreement at the special meeting or any adjournment or postponement thereof, ***is a condition*** to the completion of the merger."

161. On December 5, 2025, based on the materially false and misleading Proxy, a

majority of ODP stockholders voted to approve the Merger. As discussed in the next section below, the Proxy contained numerous materially false and misleading misrepresentations and omissions. Thus, the materially false and misleading Proxy was an essential link in causing ODP shareholders to approve the Merger, and forgo their appraisal rights.

162. On December 10, 2025, the Merger closed.

## MATERIALLY FALSE AND MISLEADING MISREPRESENTATIONS AND OMISSIONS IN THE PROXY

163. Defendants solicited ODP stockholders to vote for the Merger with a Proxy that contained materially false and misleading misrepresentations and omissions, as specified below.

### A. The Proxy Failed to Disclose That Virtually All of the Analyses Presented by J.P. Morgan Did Not Support the Fairness of the Merger Consideration

**Statement #1:**

164. In a section of the Proxy entitled "Factors the ODP Board Considered Supporting the Approval of the Merger," the Proxy purported to list "***a number of potentially positive factors***" that the Board "believed supported its decision" to approve the Merger, including "***the financial analyses presented by J.P. Morgan to the ODP Board***."

165. Notably, the statement above used the word "***analyses***." The use of the plural form rendered Statement #1 above misleading by omission because just *one* of the financial analyses with a midpoint value presented by J.P. Morgan to the Board supported approval of the Merger—i.e., the DCF analysis, which generated a midpoint per share *below* the Merger Consideration. In contrast, the two Trade Multiple Analyses presented by J.P. Morgan to the Board did *not* support approval of the Merger because they generated midpoints per share *above* the Merger Consideration. Additionally, two out of three of the analyst price targets—i.e., $35.00 per share and $41.00 per share—did not support the fairness of the Merger Consideration.

166. Disclosure that (i) a *majority*—two out of three—of the principal financial analyses presented by J.P. Morgan to the Board, and (ii) a *majority*—two out of three—analyst price targets, did *not* support approval of the Merger as fair clearly would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote. Instead, that information was omitted, and ODP stockholders were left with the false and misleading impression from Statement #1 that *multiple* J.P. Morgan analyses supported the fairness of the Merger Consideration (which was untrue).[5]

167. J.P. Morgan purported to diminish the significance of the two Trade Multiple Analyses by downgrading them to "For Reference Only" in its presentations on September 19, 2025, and September 21, 2025. But J.P. Morgan had previously presented the Trade Multiple Analyses alongside the DCF Analysis in its earlier presentations on May 27, 2025, and July 22, 2025, without designating the Trade Multiple Analyses "For Reference Only." Thus, J.P. Morgan clearly considered the Trade Multiple Analyses as equally significant as the DCF Analysis, and only recharacterized the Trade Multiple Analyses as "For Reference Only" after it became evident that they did not support the fairness of the Merger Consideration.

**<u>Statement #2:</u>**

168. Before providing a description of the DCF Analysis underlying the Fairness Opinion, the Proxy states:

> ***The following is a summary of the material financial analys<u>es</u> utilized by J.P. Morgan in connection with rendering its opinion to the ODP Board and does not purport to be a complete description of the analyses or data presented by J.P. Morgan.***

[5] As noted above, J.P. Morgan's presentations also showed the 52-week high/low range of ODP's stock price. But the Proxy did not disclose that range, and thus, it is unclear whether or not J.P. Morgan concluded that the 52-week high/low range supported the fairness of the Merger Consideration. Indeed, the 52-week high as of September 21, 2025, was $32.21 per share.

169. The use of the plural form—***analys<u>es</u>***—rendered Statement #2 above materially false and misleading by omission. By referring to multiple "material financial analyses," Statement #2 left ODP stockholders with the false and misleading impression that there were other "material financial analyses" by J.P. Morgan besides the single DCF Analysis disclosed in the Proxy that also supported the fairness of the Merger Consideration. That was untrue—the *only* "material financial analysis" by J.P. Morgan that supported the fairness of the Merger Consideration was the *single* DCF Analysis summarized in the Proxy, while the two other "material financial analyses" of J.P. Morgan (i.e., the two Trade Multiple Analyses) not summarized in the Proxy did *not* support the fairness of the Merger Consideration. In other words, the Proxy summarized a *single* "material financial analysis"—the one that just so happened to support the fairness of the Merger Consideration—while omitting other "material financial analyses," which the Proxy implied also supported the fairness of the Merger Consideration when that was actually *not* the case.

170. The fact that J.P. Morgan downgraded the Trade Multiple Analyses to "For Reference Only" in the presentation accompanying the Fairness Opinion did not render the Trade Multiple Analyses immaterial. As noted, J.P. Morgan had presented the Trade Multiple Analyses alongside the DCF Analysis in its earlier presentations on May 27, 2025, and July 22, 2025, without designating them "For Reference Only." Thus, the Trade Multiple Analyses were plainly "material financial analyses" of J.P. Morgan. Yet, the Proxy failed to advise ODP stockholders that those "material financial analyses" did not support the fairness of the Merger Consideration.

<u>**Statement #3:**</u>

171. In a section entitled "Background of the Merger," the Proxy states:

> ***Representatives of J.P. Morgan reviewed J.P. Morgan's <u>financial analyses of the merger consideration</u> provided for in the merger agreement. Following its presentation, J.P. Morgan delivered to the ODP Board its oral opinion, which was subsequently confirmed by delivery of a written opinion, dated September 22,***

> ***2025, to the effect that, as of such date, and based upon and subject to the assumptions made, procedures followed, matters considered and limitations on the review undertaken by J.P. Morgan in preparing its opinion, the merger consideration to be paid to the holders of ODP common stock in the proposed merger was fair, from a financial point of view, to such holders*[.]"**

172. Statement #3 was misleading because it indicates that "*based upon*" the "*matters considered*" by J.P. Morgan—including its "financial analyses of the merger consideration"— J.P. Morgan concluded that the Merger Consideration was "fair" to ODP stockholders. But in fact, just *one* of the financial analyses with midpoint values considered by J.P. Morgan supported approval of the Merger—i.e., the DCF analysis, which generated a midpoint per share *below* the Merger Consideration. In contrast, the two Trade Multiple Analyses presented by J.P. Morgan to the Board did *not* support approval of the Merger because they generated midpoints per share *above* the Merger Consideration. Additionally, two out of three of the analyst price targets—i.e., $35.00 per share and $41.00 per share—did not support the fairness of the Merger Consideration.

173. Disclosure that (i) a *majority*—two out of three—of the principal financial analyses presented by J.P. Morgan to the Board, and (ii) a *majority*—two out of three—analyst price targets, did *not* support approval of the Merger as fair clearly would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote. Instead, that information was omitted, and ODP stockholders were left with the false and misleading impression from Statement #3 that "based upon" *multiple* financial analyses that it "considered," J.P. Morgan concluded that the Merger Consideration was fair (which was untrue).

**Statement #4:**

174. In a section entitled "Opinion of ODP's Financial Advisor", the Proxy states:

> ***In arriving at its opinion*, J.P. Morgan, among other things: *… performed such other financial studies and analyses and considered such other information as J.P. Morgan deemed appropriate for the purposes of its opinion.***

175. Statement #4 was misleading because it indicated that J.P. Morgan "arrived" at its opinion that the Merger Consideration was fair based on the "financial studies and analyses" that it performed. But in fact, just *one* of the financial analyses with midpoint values considered by J.P. Morgan supported approval of the Merger—i.e., the DCF analysis, which generated a midpoint per share *below* the Merger Consideration. In contrast, the two Trade Multiple Analyses presented by J.P. Morgan to the Board did *not* support approval of the Merger because they generated midpoints per share *above* the Merger Consideration. Additionally, two out of three of the analyst price targets—i.e., $35.00 per share and $41.00 per share—did not support the fairness of the Merger Consideration.

176. Disclosure that (i) a *majority*—two out of three—of the principal financial analyses presented by J.P. Morgan to the Board, and (ii) a *majority*—two out of three—analyst price targets, did *not* support approval of the Merger as fair clearly would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote. Instead, that information was omitted, and ODP stockholders were left with the false and misleading impression from Statement #4 that "based upon" *multiple* financial analyses that it "considered," J.P. Morgan concluded that the Merger Consideration was fair (which was untrue).

**B. The Proxy Failed to Disclose the Expert Opinions of the Jointly Retained CRA Economist Regarding the Likelihood of Regulatory Approval of Combining ODP and [redacted]**

**Statements #5 and #6:**

177. The Proxy made the following two statements characterizing discussions between ODP and [redacted] during the sales process regarding antitrust risk posed by combining ODP and Staples:

> Between March 2025 and May 2025, ***ODP and Party D engaged in an antitrust review of a potential transaction***, and ***ODP management regularly updated the***

> ***ODP Board about the review***. ("**Statement #5**").
>
> * * *
>
> Between June 30 and August 7, 2025, ***ODP and Party D exchanged communications with respect to the allocation of the antitrust risk of a potential transaction***. ("**Statement #6**").

178. Statements #5 and #6 above disclose the existence of the Joint Antitrust Review and discussions between ODP and [redacted] concerning antitrust risk, and assert that ODP management updated the Board concerning the Joint Antitrust Review. The highlighted portions of those Statements above, however, were rendered misleading by the Proxy's failure to disclose that—as ODP management repeatedly advised the Board—the CRA economist jointly retained by ODP and [redacted] pursuant to the Joint Antitrust Review had (i) opined several times that there was a high likelihood of regulatory approval of combining ODP and [redacted] and (ii) initially quantified the likelihood of approval at 50-60%, later quantified the likelihood of approval at 70-80%, and ultimately concluded that the likelihood of approval was 90%. By virtue of the Proxy's omission of the above information, ODP stockholders were left with the false and misleading impression that there was a solitary viewpoint that a combination of ODP and Staples would pose "*significant antitrust risk*," as the Proxy put it.

179. Disclosure of the CRA economist's opinions concerning the high likelihood of regulatory approval—especially a 90% likelihood—would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote since those opinions indicated that a sale to [redacted] was a viable alternative to the Merger with minimal antitrust risk (which aligned with the views of at least two ODP investors that regulatory approval of a sale of ODP to [redacted] was likely due to the dramatic change in the regulatory environment ushered in by the new Trump Administration, and the emerging competitive threat posed by Amazon to traditional office supply distributors).

180. Statement #6 was also rendered materially false and misleading by omission because it indicated that the last time that [redacted] and ODP communicated regarding the antitrust issue was on August 7, 2024. But in fact, as discussed at the August 22 Board Meeting, [redacted] reached out again through its counsel after August 7, 2024, to share the CRA economist's final conclusion that the likelihood of regulatory approval of a sale of ODP to [redacted] was 90%. Thus, the Proxy failed to disclose a material communication from [redacted] regarding the CRA economist's opinion quantifying the likelihood of regulatory approval at 90%.

**Statement #7:**

181. With respect to the discussions at the Board meeting on May 27, 2025 ("May 27 Board Meeting") regarding [redacted] the Proxy stated in relevant part:

> On May 27, 2025, the ODP Board held a special meeting, with representatives of ODP management, J.P. Morgan and Simpson Thacher in attendance. Sarah Hlavinka, the Chief Legal Officer of ODP, ***updated the ODP Board on the results of the antitrust review relating to a potential transaction with Party D, including the identification of significant antitrust risk***.

182. The emphasized language in Statement #7 above contained materially false and misleading misrepresentations of fact, and omitted material facts necessary to render such statement not false or misleading, concerning the discussion at the May 27 Board Meeting regarding the Joint Antitrust Review. As per the relevant minutes of such meeting, Hlavinka actually advised the Board that the CRA economist had opined that a combination of ODP and [redacted] had a "high likelihood of being approved," which represented a "50-60% likelihood of approval":

> Ms. Hlavinka updated the Board on certain work done by both CRA, the economist jointly engaged by [redacted] and ODP, and Econic, the economist engaged separately by ODP, related to antitrust issues associated with a possible transaction with [redacted], as previously discussed with the Board. ***She noted that CRA had now indicated that a transaction with*** [redacted] ***would have a "high likelihood" of being approved, and had verbally***

> ***indicated that this represented approximately a 50-60% likelihood of approval*** while Econic was more conservative with respect to the likelihood of approval.

183. The Proxy omitted the emphasized information in the preceding paragraph, and instead misrepresented the discussions at the May 27 Board Meeting solely as identifying "significant antitrust risk." *See* paragraph 181 *supra*. Thus, when they voted, ODP stockholders were left with the false and misleading impression that there was a solitary viewpoint concluding that a combination of ODP and [redacted] posed "significant antitrust risk," when in fact the CRA economist jointly retained by ODP and [redacted] had reached the opposite conclusion that a combination of ODP and [redacted] had a "high likelihood of being approved," which represented a "*50-60% likelihood of approval*." Disclosure of this information would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote since it indicated that as of May 27, 2025, a sale to [redacted] was a viable alternative with a greater than 50% chance of regulatory approval (which aligned with the views of at least two ODP investors that regulatory approval of a sale to [redacted] was likely due to the dramatic change in the regulatory environment ushered in by the new Trump Administration, and the emerging competitive threat posed by Amazon to traditional office supply distributors).

**<u>Statement #8:</u>**

184. With respect to the discussions at the Board meeting on July 22, 2025 ("July 22 Board Meeting") regarding [redacted] the Proxy stated in relevant part:

> On July 22, 2025, the ODP Board held a regular meeting, with representatives of ODP management, J.P. Morgan and Simpson Thacher in attendance. At the meeting . . . ***the ODP Board also directed management to communicate to Party D the ODP Board's continuing concerns regarding antitrust risk and its view that the Party D proposal did not allocate such risk in a manner that was acceptable to the ODP Board***.

185. The emphasized language in Statement #8 above contained materially false and

misleading misrepresentations of fact, and omitted material facts necessary to render such statement not false or misleading, concerning the discussion at the July 22 Board Meeting regarding [redacted] since, as per the relevant minutes of such meeting, Hlavinka actually reported to the Board, among other things, that after reassessing its conclusion, the CRA economist jointly retained by ODP and [redacted] had determined that a combination of ODP and [redacted] had a "70-80% chance of obtaining regulatory approval":

> ***Ms. Hlavinka then reminded the Board that economist Charles River Associates (CRA) had previously conducted a preliminary economic study based on a joint engagement by the Company and*** [redacted] ***to assess the regulatory implications of a potential transaction between ODP and*** [redacted] ***and had concluded that the transaction had a "high likelihood" of success. CRA, in a conversation among CRA and ODP's and*** [redacted] ***respective legal counsel, had suggested that a "high likelihood" likely corresponded to a 50-60% chance of achieving clearance***. Ms. Hlavinka noted that, prior to sending the [redacted] ***had unilaterally contacted CRA and asked CRA to reassess its conclusion, and CRA had determined that a "high likelihood" represented a 70-80% chance of obtaining regulatory approval, but had not otherwise revised its analysis*** . . . Ms. Hlavinka advised the Board that the Company's advisors, including the economist engaged separately by the Company, had not altered their respective conclusions with respect to the likelihood of the transaction achieving clearance, which was more conservative than the conclusion presented by CRA.

186. The Proxy omitted the emphasized information in the minutes quoted in the preceding paragraph. Thus, when they voted, ODP were left with the false and misleading impression that there was a solitary viewpoint concluding that a combination of ODP and [redacted] would pose "significant antitrust risk," when in fact the CRA economist jointly retained by ODP and [redacted] disagreed, and after reassessing its conclusion, determined that a combination of ODP and [redacted] had a "70-80% chance of obtaining regulatory approval." Disclosure of this information would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote since it indicated that as of July 22, 2025, a sale to [redacted] remained a viable alternative with a 70-80% chance of regulatory approval

(which aligned with the views of at least two ODP investors that regulatory approval of a sale to Staples was likely due to the dramatic change in the regulatory environment ushered in by the new Trump Administration, and the emerging competitive threat posed by Amazon to [redacted]

**Statement #9:**

187. The Proxy's discussion of the Board's meeting on August 22, 2025 ("August 22 Board Meeting") makes no mention of [redacted] at all:

> On August 22, 2025, the ODP Board held a special meeting, with representatives of ODP management, J.P. Morgan and Simpson Thacher in attendance. At the meeting, the ODP Board discussed with representatives. of ODP management and ODP's advisors the status of the discussions with Atlas, Party G and Party J, as well as the indication of interest received from Party K. ODP management discussed with the ODP Board ODP management's revised financial projections for ODP for the fiscal years 2025 through 2029, which remained unchanged from the February Projections, except for immaterial changes to the projections for the 2025 fiscal year based on ODP's actual results year-to-date (the "Management Projections"). Following such discussion, at its special meeting held on September 19, 2025, the ODP Board approved the Management Projections for use by J.P. Morgan in its financial analyses relating to any proposed transaction.

188. Statement #9 above omitted material facts necessary to render such statement not false or misleading. As per the relevant minutes of the August 22 Board Meeting, after receiving the letter sent by Schoppert on August 12, 2025 ("August 12 Schoppert Letter"), [redacted] counsel reached out to ODP's counsel to advise that the CRA economist had revisited its conclusion, and determined that a sale of ODP to [redacted] "*had a 90% chance of obtaining regulatory approval*," and that Bleisch had advised the Board of this development:

> Mr. Bleisch then updated the Board on an additional development with [redacted] ***He stated that external legal counsel for*** [redacted] ***had contacted the Company's external legal counsel, Simpson Thacher & Bartlett LLP (STB) to advise that Charles River Associates (CRA), the economist originally jointly engaged by*** [redacted] ***and the Company, had revisited its conclusion and concluded that an acquisition of the Company by*** [redacted] ***had a <u>90% chance of obtaining regulatory approval</u>***. Mr. Bleisch reminded the Board

> that the economist engaged solely by the Company had not changed its view that the likelihood of approval was no better than 50%. Discussion ensued.

189. The Proxy omitted the emphasized information in the preceding paragraph. *See* paragraph 187 *supra*. Thus, when they voted, ODP stockholders were left with the false and misleading impression that there was a solitary viewpoint concluding that a combination of ODP and [redacted] would pose "significant antitrust risk," when in fact [redacted] counsel had reached out to ODP's counsel after the August 12 Schoppert Letter to advise that the CRA economist had "revisited its conclusion and concluded that an acquisition of the Company by [redacted] had a 90% chance of obtaining regulatory approval." Disclosure of this information would have significantly altered the total mix of information made available to ODP stockholders when they were deciding how to vote since it indicated that as of August 22, 2025, a sale to [redacted] remained a viable alternative with a 90% chance of regulatory approval (which aligned with the views of at least two ODP investors that regulatory approval of a sale to [redacted] was likely due to the dramatic change in the regulatory environment ushered in by the new Trump Administration, and the emerging competitive threat posed by Amazon to traditional office supply distributors).

### C. The Proxy Failed to Disclose the Amount of the Bid Submitted by [redacted] and How it Compared to the Bids of Atlas and Other Potential Counterparties

**Statement #10:**

190. Concerning the progression of competing bids to acquire ODP in June 2025, the Proxy stated in relevant part:

> On June 11, 2025, ODP received an oral non-binding indication of interest from Party F, a financial investor, which was subsequently followed by a written non-binding indication of interest. ***Party F's indication of interest (the "June Party F Proposal") reflected the highest valuation, which was in excess of the May Atlas Indication of Value . . .*** On June 23, 2025, Party D submitted to Ms. Schoppert a non-binding written indication of interest for an acquisition of 100% of the common stock of ODP for cash (the "Party D Proposal"). Ms. Schoppert informed the ODP Board of the Party D Proposal.

191. The emphasized language in Statement #10 above did not disclose that Party F submitted a bid for $22.50 per share on June 11, 2025, and instead indicated only that the June Party F Proposal "reflected the highest valuation" as of such date. But then when [redacted] submitted a bid for $24.00 per share on June 23, 2025, the Proxy failed to disclose that, as of such date, [redacted] offer became the highest bid, and Party F's bid no longer reflected the "highest valuation." Disclosure of this information would have significantly altered the total mix of information made available to ODP stockholders when they voted since it would have disclosed that even without the benefit of non-confidential information, [redacted] was the highest bidder during June 2025, and indicated that, with access to confidential information that the Board ultimately refused to provide, [redacted] might have outbid Atlas. Indeed, at least two ODP investors concluded that Sycamore could have justified bidding $29.00 or more per share given the tremendous synergies (i.e., >$1 billion) that could be realized from combining ODP and Staples, with Tilson calling it a "no brainer" for Sycamore. Instead, ODP stockholders were left with the false and misleading impression that [redacted] never submitted a competitive bid.

**Statement #11:**

192. Concerning the further progression of competing bids to acquire ODP in July 2025, the Proxy stated in relevant part:

> On July 17, 2025, Atlas submitted a non-binding written indication of interest to acquire 100% of the common stock of ODP for $23.50 per share in cash (the "Revised July Atlas Proposal") . . . Also on that date, Party G submitted a non-binding written indication of interest to acquire 100% of the common stock of ODP ***for an amount in cash per share in excess of the Revised July Atlas Proposal***.

193. The emphasized language in Statement #11 did not disclose that Party G's bid on July 17, 2025, was $24.00 per share, and instead indicated only that the July Party G Proposal

exceeded the Revised July Atlas Proposal (which, unbeknownst to ODP stockholders, was $23.50 per share). But at the same time, the Proxy failed to disclose that the July Party G Proposal did *not* exceed [redacted] bid for $24.00 per share on June 23, 2025. Disclosure of this information would have significantly altered the total mix of information made available to ODP stockholders when they voted since it would have disclosed that even without the benefit of non-confidential information, [redacted] remained the highest bidder as of July 2025, and indicated that with access to confidential information that the Board ultimately refused to provide, [redacted] might have outbid Atlas. Indeed, at least two ODP investors concluded that Sycamore could have justified bidding $29.00 or more per share given the tremendous synergies (>$1 billion) that could be realized from combining ODP and Staples, with Tilson calling it a "no brainer" for Sycamore. Instead, ODP stockholders were left with the false and misleading impression that [redacted] never submitted a competitive bid.

**Statement #12:**

194. Concerning the further progression of competing bids to acquire ODP in early August 2025, the Proxy stated in relevant part:

> On August 9, 2025, representatives of Party J submitted a written non-binding indication of interest to acquire 100% of the common stock of ODP reflecting a range of consideration in cash per share, ***the high point of which was in excess of the Revised July Atlas Proposal***.

195. The emphasized language in Statement #12 above did not disclose that Party J's bid on August 9, 2025, was $23.00 to $24.00 per share, and instead indicated only that "the high point" of Party J's bid exceeded the Revised July Atlas Proposal (which, unbeknownst to ODP stockholders, was $23.50 per share). At the same time, the Proxy also failed to disclose that the August Party J Proposal did not exceed [redacted] bid for $24.00 per share on June 23, 2025. Disclosure of this information would have significantly altered the total mix of information made

available to ODP stockholders when they voted since it would have disclosed that even without the benefit of non-confidential information, [redacted] remained the highest bidder as of early August 2025 (alongside the August Party J Proposal and July Party G Proposal), and indicated that with access to confidential information that the Board ultimately refused to provide, [redacted] might have outbid Atlas. Indeed, at least two other analysts concluded that Sycamore could have justified bidding $29.00 or more per share given the tremendous synergies (>$1 billion) that could be realized from combining ODP and Staples, with Tilson calling it a "no brainer" for Sycamore. Instead, ODP stockholders were left with the false and misleading impression that [redacted] never submitted a competitive bid.

**<u>SOURCES OF DEFENDANTS' DUTIES WITH RESPECT TO CONTENTS OF PROXY</u>**

196. Defendants were negligent because, as specified below, they had a duty to exercise reasonable care in reviewing the Proxy to ensure that it did not contain any affirmative misrepresentations or omissions that rendered statements therein misleading. Defendants failed to fulfill that duty insofar as the Proxy misrepresented material facts within their sphere of knowledge, and omitted material facts within their sphere of knowledge that rendered statements in the Proxy misleading. Specifically, as specified above, the Proxy misleadingly omitted material facts concerning: (i) the multiple material financial analyses of J.P. Morgan that did *not* support the fairness of the Merger Consideration (thus creating the false and misleading impression in the Proxy that multiple material financial analyses of J.P. Morgan supported the fairness of the Merger Consideration); (ii) the expert opinions and quantifications of the jointly retained CRA economist regarding the likelihood of regulatory approval of combining ODP and [redacted] and (iii) the amount of [redacted] bid and how it compared to the bids of Atlas and other potential counterparties (with the latter two omissions creating the false and misleading impression that the

[redacted] bid was not a viable alternative to the Merger, which was untrue).

197. By virtue of their attendance at and participation in Board meetings where the following subjects were extensively discussed, and their receipt at such meetings of reports, presentations and other materials concerning the following subjects, Defendants had personal knowledge of the omitted facts concerning (i) the financial analyses of J.P. Morgan; (ii) the expert opinions and quantifications of the jointly retained CRA economist regarding the likelihood of regulatory approval of combining ODP and [redacted] and (iii) the amount of [redacted] bid and how it compared to the bids of Atlas and other potential counterparties.

198. Defendants owed shareholders a duty to ensure that the Proxy did not contain material misrepresentations or omit material facts that rendered statements therein misleading given their personal involvement in ODP's sale process (including multiple Board meetings), their knowledge of the facts at issue that were omitted from the Proxy, and the fact that they expressly assumed responsibility for the contents of the Proxy—specifically, Smith by signing the Proxy, and all of the Defendants by authorizing the Proxy to be issued "By Order of the ODP Board."

199. Under Section 14(a)/Rule 14a-9, ODP's Code, the Merger Agreement, and professional standards governing their conduct, Defendants owed stockholders a duty to carefully review the Proxy before they authorized its dissemination, to ensure that it did not contain any material misrepresentations or omit material facts necessary to make the statements therein not misleading.

200. Defendants had a duty under Section 14(a)/Rule 14a-9 to carefully read and review the Proxy—especially those parts about which they had personal knowledge—so as not to solicit shareholders "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made . . . omits to state any material fact

necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a); *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 778 (3d Cir. 1976) ("[the] directors owed a duty to the plaintiffs under section 14(a) of the Act fully and fairly to disclose the material facts in the proxy materials they issued to them").

201. Defendants' duty was also made explicit in ODP's Code, which provided that the "Company communicates full, fair, accurate, timely and understandable disclosure in all of our public communications and in the information that we provide to the Securities and Exchange Commission" in compliance with the federal securities laws. On the second page of the Code (which he signed) Smith stressed that the Code "***applies to all of us; <u>me</u>; [and] <u>our Board of Directors</u>***."

202. Further, under Section 3.16 of the Merger Agreement, ODP had a contractual obligation not to supply information for inclusion in the Proxy which "contain[ed] any untrue statement of a material fact or omit[ted] to state any material fact:

> **Section 3.16. Proxy Statement**. None of the information supplied or to be supplied by the Company for inclusion or incorporation by reference in the proxy statement to be sent to the stockholders of the Company in connection with the Stockholders Meeting (such proxy statement, as amended or supplemented, the "Proxy Statement") will, on the date it (and any amendment or supplement thereto) is first filed with the SEC, or at the time it is first mailed to the stockholders of the Company or at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not false or misleading.

203. Further, Chapter 11 of the *Corporate Director's Handbook* (American Bar Association, 7th edition 2020) ("ABA Handbook") titled "Duties Under the Federal Securities Laws" provides important guidance to directors concerning the above disclosure duties, stating with respect to "Proxy Statements" that "[d]irectors should be attentive to the procedures followed in preparing the corporation's proxy statements. It is good practice for every director to review a

reasonably close-to-final draft of the proxy statement before it is distributed or filed with the SEC, particularly sections dealing with matters about which the director has personal knowledge. . ."

204. Likewise, Chapter 4 of the ABA Handbook titled "Risk Oversight and Compliance, states with respect to "Disclosures":

> The corporation's disclosure documents (e.g., annual reports, quarterly reports, current reports, ***proxy statements***, prospectuses, earnings releases, and investor presentations) must fairly present and ***not omit material information about the corporation and its business, financial condition, results, prospects, and risks***. Management is responsible for drafting and preparing the corporation's disclosures, and many public companies establish management disclosure committees with responsibility for preparing the corporation's SEC filings and other public financial disclosures. Although management has responsibility for a corporation's financial statements, the audit committee has oversight responsibility over all financial disclosures. In any case, the board should assure that the corporation's procedures for identifying matters requiring disclosure and preparing disclosure documents are reasonably designed to produce accurate and complete public disclosures in an appropriate and timely manner. In addition to the disclosure documents requiring their signatures, directors should be familiar with all the corporation's significant disclosure documents and assure that those documents convey all material information about the business in a legally compliant and timely manner.

205. In sum, Defendants negligently violated Section 14(a) and Rule 14a-9 because they failed to fulfill their duty to exercise reasonable care in reviewing the Proxy, and thus failed to prevent the Proxy from misrepresenting and omitting material facts within their sphere of knowledge and from containing materially false and misleading statements.

## LOSS CAUSATION ALLEGATIONS

206. Defendants made or caused to be made the materially false and misleading misrepresentations and omissions in the Proxy identified above in the section of this Complaint entitled "Materially False and Misleading Misrepresentations and Omissions in the Proxy."

207. The materially false and misleading misrepresentations and omissions in the Proxy induced a majority of ODP stockholders to approve the Merger, thereby forcing Plaintiff and other Class members to (i) be cashed out of their ODP shares for Merger Consideration that was less

than the fair value of ODP; and (ii) forfeit their statutory appraisal rights under Delaware law to dissent and seek the fair value of their ODP shares via appraisal. As a result, the Proxy's materially false and misleading misrepresentations and omissions caused Plaintiff and other Class members to suffer damages under Section 14(a) of the Exchange Act.

208. Had the information that was concealed by virtue of the materially false and misleading misrepresentations and omissions in the Proxy been made known to the market, Defendants would not have been able to secure approval of the Merger by a majority of ODP stockholders, and Plaintiff and other Class members would have retained their ODP shares and not been deprived of the fair value of their ODP shares for the unfair Merger Consideration, unless ODP or another entity offered ODP stockholders a higher price for their shares that reflected the fair value of ODP.

209. Alternatively, Class members could have exercised their statutory appraisal rights to dissent and seek the fair value of their ODP shares.

210. The following facts indicate that the fair value of ODP's common stock exceeded the Merger Consideration. *First*, the final FV/2025E Adjusted EBITDA Multiple Analysis presented by J.P. Morgan on September 21, 2025, using a reference range of multiples of FV/2025E Adjusted EBITDA of comparable specialty retail and B2B companies, indicated a standalone value for ODP of $18.75 to $42.75 per share with a midpoint of $30.67 per share, which exceeded the Merger Consideration, and was higher than the midpoint values of $29.76 and $29.36 in May and July 2025, respectively, thus indicating a trend of improving valuations.[6]

211. *Second*, the FV/2026E Adjusted EBITDA Multiple Analysis presented by J.P.

[6] In its presentation, J.P. Morgan calculated the midpoint of this analysis at $30.67 per share. But arithmetically, the midpoint value per share is actually $30.75 per share.

Morgan on September 21, 2025, using a reference range of multiples of FV/2026E Adjusted EBITDA of comparable specialty retail and B2B companies, indicated a standalone value for ODP of $18.25 to $40.00 per share with a midpoint of $29.13 per share, which exceeded the Merger Consideration, and was higher than the midpoint values of $27.69 and $27.26 in May and July 2025, respectively, thus indicating a trend of improving valuations.

212. *Third*, as per J.P. Morgan's presentation on September 21, 2025, two out of the three Wall Street analysts covering ODP set price targets of $35.00 per share and $41.00 per share in August and September 2025, respectively, based on ODP's strong results in Q2 2025, and improving standalone prospects (as per language from the reports published by each analyst quoted by J.P. Morgan in its presentation on September 21, 2025; *see* paragraph 152 above).

213. *Fourth*, even without the benefit of any confidential information, [redacted] bid $24.00 per share for ODP (which was the highest offer from late June 2025 to early August 2025), and at least two ODP investors opined in August and September 2025, that Sycamore could have justified paying $29.00 or more per share for ODP based on the tremendous synergies (>$1 billion) that could be realized by combining ODP and Staples (with Tilson characterizing it as a "no brainer" for Sycamore).

214. *Fifth*, in February 2025, Atlas submitted a bid of $30.00 per share to acquire ODP, which it later reduced to $21.25 per share in cash in April 2025 due to temporary market volatility caused by President Trump's tariffs. But as Smith later explained on earnings calls, ODP had successfully mitigated the impact of the tariffs. Further, as per Smith's public statements in press releases and on earnings calls, ODP's prospects had substantially improved during Q1 and Q2 2025. Thus, Atlas' bid of $30.00 per share in February 2025 when ODP's prospects were more uncertain indicates that once ODP's prospects substantially improved for two straight quarters,

and tariffs had been mitigated, $28.00 per share plainly undervalued ODP.

215. In sum, because ODP's fair value exceeded the Merger Consideration, and the materially false and misleading misrepresentations and omissions in the Proxy enabled Defendants to secure approval of the Merger by a majority of ODP stockholders, the materially false and misleading misrepresentations and omissions in the Proxy caused Plaintiff and other Class members to suffer damages in an amount equal to the difference between (i) the Merger Consideration, and (ii) the fair value of their shares as calculated in accordance with recognized methods of valuation.

## CLASS ACTION ALLEGATIONS

216. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and a class ("Class") consisting of all ODP stockholders who held ODP shares on October 21, 2025 (the record date for voting on the Merger), and held their shares through December 10, 2025 (the close of the Merger), and had their shares exchanged for the Merger Consideration (the "Class Period"). Excluded from the Class are Defendants herein and any natural person or entity affiliated with any Defendant.

217. This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because:

(a) the Class is so numerous that joinder of all members is impracticable. As of the Record Date, there were 30,117,856 shares of ODP common stock outstanding, held by thousands of individuals and entities throughout the country. The actual number of former public stockholders of ODP will be ascertained through discovery;

(b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i. whether Defendants made material representations in the Proxy, and omitted material facts from the Proxy so as to render statements therein misleading, in violation of Section 14(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder; and

ii. whether the Individual Defendants violated Section 20(a) of the Exchange Act.

(c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class. Indeed, Plaintiff has already pursued a diligent investigation of the violations alleged herein via the Section 220 Demand, which resulted in the production of the Section 220 Documents forming the basis for many of central allegations herein;

(d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class; and

(e) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because: (i) Plaintiff is unaware of any reason why Class members would have a special interest in individually controlling the prosecution of separate actions; to the contrary, shareholders would typically find it impractical to commence individual lawsuits to hold sophisticated defendants accountable for the federal securities law violations alleged herein; (ii) Plaintiff is unaware of any litigation concerning the claims alleged herein that is already being pursued by other Class members; (iii) it is desirable to litigate the asserted claims in this Court because ODP is headquartered in Boca Raton, Florida and Plaintiff believes a substantial part of the conduct giving rise to the asserted claims occurred within this District; and (iv) there are not likely to be any difficulties in managing this action as a class action; to the contrary, disputes arising out of alleged misconduct with respect to publicly-traded securities are particularly well-suited for class action treatment.

## COUNT I

**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Against all Defendants)**

218. Plaintiff repeats and re-alleges the allegations in paragraphs 1–217 as if fully set forth herein.

219. As detailed above, each of the Defendants participated in multiple Board meetings during the sales process culminating in the approval of the Merger, and during such meetings, had access to and extensively discussed oral and written reports and other materials concerning various subjects, including: (i) J.P. Morgan's presentations, (ii) the Joint Antitrust Review undertaken by the CRA economist jointly retained by ODP and [redacted] and the CRA economist's opinions stating that there was a "high likelihood" of regulatory approval of a sale of ODP to [redacted] and quantifying that likelihood first at 50-60%, then at 70-80%, and finally at 90%; and (iii) negotiations with Atlas, [redacted] and other potential counterparties, and the amount of the bids submitted by each of those entities.

220. As detailed above, each Defendant owed a duty under Section 14(a)/Rule 14a-9, ODP's Code, the Merger Agreement, and professional standards governing their conduct, to carefully review the Proxy before they authorized its dissemination to ODP stockholders to solicit their votes, to ensure that it did not contain any material misrepresentations or omissions of material facts that rendered statements therein misleading.

221. Each of the Defendants authorized the dissemination of the Proxy, which states that it was issued "By Order of the ODP Board." Further, Smith signed the Proxy.

222. Defendants failed to fulfill their duty to exercise reasonable care in reviewing the Proxy and to prevent the Proxy from containing misrepresentations of material fact and omissions of material facts that rendered statements therein misleading. As a result of such failure, the Proxy

disseminated to ODP stockholders to secure their approval of the Merger contained misrepresentations of material fact and omissions of material facts that rendered statements therein misleading, as specified above.

223. The misleading misrepresentations and omissions in the Proxy specified above were material since disclosure of the facts misrepresented or omitted would have significantly altered the total mix of information made available to reasonable ODP stockholders when deciding how to vote. That is, reasonable ODP stockholders would have considered the misrepresented and omitted facts important when deciding how to vote.

224. The materially false and misleading Proxy was an essential link in securing approval of the Merger since the majority vote of ODP stockholders solicited by the Proxy was required to approve the Merger. The materially false and misleading Proxy also caused ODP stockholders to forego their appraisal rights.

225. Absent the material misrepresentations and omissions in the Proxy authorized by Defendants, a majority of ODP stockholders would not have voted for the Merger, and the Merger would not have been approved and would not have closed. Thus, the material misrepresentations and omissions in the Proxy caused the damages suffered by Plaintiff and other Class members when the Merger was approved by virtue of the materially false and misleading Proxy, and Plaintiff and other Class members were forced to sell their shares for the inadequate Merger Consideration that did not reflect the fair value of ODP.

226. By reason of the foregoing, Defendants negligently violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and are liable to Plaintiff and other Class members for damages. The Individual Defendants' negligence is imputed to ODP.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

227. Plaintiff repeats and re-alleges the allegations in paragraphs 1–217 as if fully set forth herein.

228. As set forth above, Defendant ODP committed primary violations of the federal securities laws by virtue of disseminating the Proxy with materially false and misleading misrepresentations and omissions to solicit ODP stockholders to approve the Merger for the inadequate Merger Consideration.

229. At all relevant times (including during the Class Period), the Individual Defendants by virtue of their positions as directors of ODP, and Defendant Smith by further virtue of his position as ODP's CEO, had the ability to control, and did control, the general business affairs of ODP, including without limitation reviewing, approving and authorizing the dissemination of the Proxy filed by ODP with the SEC to solicit ODP stockholders to approve the Merger for the inadequate Merger Consideration.

230. Accordingly, the Individual Defendants had the power to control and influence the particular corporate actions by Defendant ODP that gave rise to the primary Exchange Act violations by Defendant ODP alleged herein, and did exercise such control and influence. In particular, as noted, the Proxy was signed by Defendant Smith, and stated that it was issued "By Order of the ODP Board."

231. By reason of the foregoing, the Individual Defendants had the ability to exercise control and did exercise control over a corporate defendant (i.e., Defendant ODP) that committed a primary violation of the federal securities laws, and are thus liable pursuant to Section 20(a) of the Exchange Act for such primary violations.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Determining that the Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder;

C. Determining that each of the Individual Defendants violated Section 20(a) of the Exchange Act;

D. Awarding Plaintiff and the Class against all of the Defendants, jointly and severally, all damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory, rescissory and quasi-appraisal damages, or disgorgement by Defendants, plus pre-judgment and post-judgment interest thereon;

E. Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 18, 2026

**SMITH, GAMBRELL & RUSSELL, LLP**

*/s/ Richard D. Rivera*
Richard D. Rivera
Florida Bar No.: 0108251
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Tel.: (904) 598-6110
Fax: (904) 598-6210
rrivera@sgrlaw.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde (*pro hac vice* forthcoming)
Miles D. Schreiner (*pro hac vice* forthcoming)
Jonathan T. Lerner (*pro hac vice* forthcoming)
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com
jlerner@monteverdelaw.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter (*pro hac vice* forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
jfruchter@wohlfruchter.com

*Counsel for Plaintiff*